**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Valerie FREDERICKS, Craig Calver, and
Leon Perry, Defendants-Appellants.**

No. 77–5802.

United States Court of Appeals,
Fifth Circuit.

Dec. 15, 1978.

Rehearing Denied Jan. 11, 1979.

Stuart A. Markus, Laurie S. Silvers, Miami, Fla., for Valerie Fredericks.

Melvyn Kessler, Miami, Fla., for Craig Calver and Leon Perry.

Jack V. Eskenazi, U. S. Atty., Michael Sullivan, K. M. Moore, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Valerie Fredericks, Craig Calver, and Leon Perry have been found guilty by a jury for conspiring to distribute methaqualone hydrochloride (quaalude capsules), in violation of 21 U.S.C.A. § 846. The Government investigation which led to their convictions was hardly exemplary, but we find that none of the defendants' asserted points of error require reversal and we therefore affirm the judgments entered below.

### I. The Evidence Before The Jury

The evidence introduced at trial consisted primarily of the testimony of three witnesses: Armando Marin and Robert Fredericks, both Special Agents with the Drug Enforcement Administration (DEA), and Robin Ehrlich, who was an unindicted coconspirator of the three defendants.[1]

Special Agent Marin testified that on July 30, 1977, while acting in an undercover capacity, he was introduced to Craig Calver by a Carlos Lagos-Martinez at Calver's residence. In the presence of Marin and an informant, Calver asked Lagos-Martinez if he was still interested in obtaining some guaaludes, and Lagos-Martinez said that he was.

Two days later, according to Marin's testimony, while in Lagos-Martinez's hotel room, he answered a telephone call for Lagos-Martinez from "Leon." The gist of Leon's message was that he had the 2,000 quaaludes that Lagos-Martinez desired. Marin told Leon that he, Marin, was to be the actual purchaser of the quaaludes and that he wanted 10,000 tablets, not 2,000.

Leon told Marin that obtaining 10,000 quaaludes would take a while longer and that he would call Marin back later. Shortly thereafter, Leon called again and told Marin that he would be able to supply 10,000 tablets, but that Marin would have to pick them up at "Craig's house." Marin testified that he subsequently ascertained that Leon was referring to the apartment of Craig Calver.

Less than an hour after Leon's second call, Marin called Craig Calver's apartment. Calver answered the phone and Marin asked to speak to Leon. Calver told him that Leon was "getting something together" and was not there at the moment. Marin asked if Leon was getting the quaaludes together and Calver answered: "Yes. You are going to have to come and pick them up."

Marin then testified that about 9:00 p.m. on the same day, August 1, he went to Calver's apartment along with an informant. Both Calver and Leon Perry were at the apartment, and Marin was introduced to Perry by Calver. As Marin shook Perry's hand, he observed to Perry that they had earlier spoken to one another on the phone and Perry acknowledged that fact. Perry then asked Marin if he had the money for the quaaludes. Marin assured Perry that he did, but said that he would not reveal any money until he could see the quaaludes. Perry told Marin that the quaaludes were at his girlfriend Robin's house, which was a few buildings away, and that Marin would have to wait at Calver's apartment for a few minutes. Calver and Perry then left the apartment.

When Calver and Perry returned about ten minutes later, Perry told Marin that they would have to postpone the transaction for a while because there were too many police officers in the area. Calver indicated his agreement that the deal would have to be postponed. Marin then revealed the fact that he was a federal officer and arrested Calver and Perry.

---

1. Defendant Craig Calver also testified, but his testimony was limited to his educational background and his general good character, and is not pertinent to this appeal. The other two defendants did not take the stand.

Special Agent Fredericks corroborated some of the testimony given by Agent Marin. Fredericks testified that on the night of August 1, 1977, he, along with other agents, was stationed outside Craig Calver's apartment. In the course of his surveillance, he observed Agent Marin enter the apartment, defendants Calver and Perry leave the apartment, and finally Calver and Perry return to the apartment, after which he assisted Agent Marin in arresting the two male defendants.

The final Government witness was Robin Ehrlich, the unindicted coconspirator. She testified that she shared an apartment with Leon Perry and that on August 1, 1977, Perry told her that some people would be dropping by. Later that day, according to Ehrlich's testimony, the defendant Valerie Fredericks arrived by taxi with a suitcase. Ehrlich testified that while in the presence of herself, Perry, Fredericks, and another individual, the suitcase was opened revealing stacks of foil packages, which Fredericks referred to as quaaludes. Fredericks then stated that before she relinquished the quaaludes, she would have to receive some money, and she was assured that some men were coming with the money.

Ehrlich also testified that later during the same evening, after 9:00 p. m., she and Fredericks left Perry's apartment. When asked why they left the apartment, Ehrlich responded that she was concerned about Perry's whereabouts and Fredericks "wanted to find out what happened with the deal." According to Ehrlich's subsequent testimony, the two women went to Craig Calver's apartment, where they found Calver and Perry and a number of agents.

After the Government rested its case, Special Agent Marin was recalled to the stand by the defense. At that point it was brought out that he had arrested Valerie Fredericks at Calver's apartment approximately twenty minutes after she had arrived there.

\* \* \*

This account of the testimony heard by the jury is not a complete account of the facts relevant to our disposition of this appeal. But we have separately presented the evidence before the jury in order to respond to the first contention made by each of the three appellants—that there was insufficient competent evidence to sustain the jury's verdict that they had conspired to distribute quaaludes. Each of the appellants also urges that their convictions must be reversed on three other grounds. We will supply the background for each of those contentions when we respond to them in the course of this opinion.

## II. Sufficiency Of The Legally Competent Evidence

At the close of the prosecution's case-in-chief, each of the defendants moved for acquittal on the ground that the prosecution had failed to introduce sufficient, legally competent evidence to prove that a conspiracy existed, that each defendant knew about it, and that each defendant voluntarily participated in the conspiracy.[2] The defendants' motions were denied. The test for sufficiency of proof on a motion for judgment of acquittal, and on review of the denial of such a motion, is whether the jury might reasonably conclude that the evidence, viewed in the light most favorable to the prosecution, is inconsistent with every reasonable hypothesis of the accused's innocence. E. g., United States v. Barrera, 5 Cir., 1977, 547 F.2d 1250, 1255; United States v. Warner, 5 Cir., 1971, 441 F.2d 821, 825, cert. denied, 1971, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58.

---

**2.** The essential elements of a criminal conspiracy are an agreement by two or more persons to commit an offense against the United States attended by an overt act by one of them in furtherance of the agreement. E. g., United States v. Perez, 5 Cir., 1973, 489 F.2d 51, 61, cert. denied, 1974, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664. While no formal agreement nor direct evidence is necessary to establish a conspiracy, United States v. Barrera, 5 Cir., 1977, 547 F.2d 1250, 1256, "[t]here must be proof beyond a reasonable doubt that a conspiracy existed, that the accused knew of it, and that the accused, with that knowledge, voluntarily became a part of it," United States v. Gutierrez, 5 Cir., 1977, 559 F.2d 1278, 1280.

■ Assuming for the moment that all the evidence recounted above was properly admitted, there is no question that it was sufficient for the jury to exclude every reasonable hypothesis but that of the defendants' guilt. The jury could infer the existence of an illegal conspiracy and the defendants' knowing and willing participation in it from the initial meeting of Calver and Special Agent Marin at Calver's apartment, from the phone conversations Marin had with Perry and Calver negotiating and making arrangements for the sale of 10,000 quaaludes, from the conversations that occurred at Calver's apartment when Marin went there to complete the sale, from the postponement of the deal by Perry and Calver because too many police were in the vicinity, from Fredericks' arrival at Perry's apartment with a suitcase of quaaludes and the conversation between Fredericks and Perry about money, and from Fredericks' trip to Calver's apartment to find out what was happening with the deal.[3] And the jury was warranted in deducing from this evidence inferences that excluded beyond a reasonable doubt any possibility of innocence.

The crucial question then is whether all this evidence was properly admitted for the jury's consideration. In their briefs, the appellants challenged the admission of Robin Ehrlich's testimony in its entirety on the ground that it was obtained and introduced in violation of both their constitutional rights and hers. In Part VI of this opinion, however, we reject this argument and hold that notwithstanding any violation of Robin Ehrlich's rights, appellants were not entitled to the suppression of her testimony.

■ In oral argument, appellants raised an additional objection to the competence of the evidence. Each appellant claimed that the prosecution failed to establish the necessary foundation for the admission of various coconspirator statements against all of the defendants and not just the declarant. F.R.Evid. 801(d)(2)(E) provides that statements made by a coconspirator during the course and in furtherance of the conspiracy are not hearsay and may be admitted against other coconspirators.[4] Nevertheless, such statements cannot serve as the sole proof that the defendant against whom they are admitted indeed was a member of the conspiracy. The Government must produce independent evidence both that the conspiracy existed and, with respect to any defendant coconspirator against whom the statements are admitted, that he or she was a member of that conspiracy.[5] The Government may use, how-

---

**3.** The overt act requirement need be satisfied by only one of the coconspirators. *See* note 2, *supra.* In this case, the jury could have found that all three defendants committed the necessary overt act—for example, that Perry telephoned Marin to make arrangements for the transaction and contacted Fredericks to supply the quaaludes; that Calver, along with Perry, left Calver's apartment to pick up the quaaludes; and that Fredericks actually supplied the quaaludes.

**4.** "Hearsay" is defined in Rule 801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(d)(2)(E) in essence codifies the long-recognized coconspirator exception to the hearsay rule by providing that "[a] statement is not hearsay if * * * [t]he statement is offered against a party and is * * * a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

**5.** The declarations of one conspirator made in furtherance of the objects of the conspiracy, and during its existence, are admissible against all members of the conspiracy. * * * But a defendant's connection with a conspiracy cannot be established by extrajudicial declarations of a co-conspirator, made out of the presence of the defendant. There must be proof *aliunde* of the existence of the conspiracy, and of the defendant's connection with it, before such statements become admissible *as against a defendant not present when they were made.* * * *
*United States v. Apollo,* 5 Cir., 1973, 476 F.2d 156, 159, *quoting Montford v. United States,* 5 Cir., 1952, 200 F.2d 759, 760; *see also United States v. Hansen,* 5 Cir., 1978, 569 F.2d 406, 409.
*Apollo* also announced certain procedures for determining whether these conditions of proof *aliunde* are satisfied. The *Apollo* procedural framework was recently overhauled in the Court's opinion in *United States v. James,* 5 Cir., 1978, 576 F.2d 1121, *now pending on rehearing en banc,* but neither this aspect of

ever, *any* otherwise admissible evidence in meeting this threshold burden of production, *including*—with respect to any particular defendant—any out-of-court statements made by that defendant in the presence of a witness testifying under oath.[6]

■■■ Contrary to the appellants' assertion, the prosecution satisfied the conditions for application of Rule 801(d)(2)(E). Calver's conversations with Marin as well as his conduct at his apartment on the night of August 1 constituted sufficient independent evidence of his participation in the conspiracy for the out-of-court statements of the other coconspirators to be admitted against him. Similarly, Perry's conversations with Marin and in the presence of Ehrlich, as well as his activities both at his apartment and at Calver's, permitted the admission of his fellow conspirator's statements against him. Finally, the statements of Calver and Perry could be used against Fredericks by virtue of her statements and actions in the presence of, and as attested to by, Robin Ehrlich.

### III. A Prosecutorial Lapse

■■■ The second ground upon which appellants seek to have their convictions overturned involves an improper remark by the prosecutor during his closing argument. The impulse for the prosecutor's indiscretion was provided by the attorney for Craig Calver, who, during his summation to the jury, legitimately attempted to undermine the Government's case by asking, rhetorically, why the Government had not called several possible material witnesses, among

them Carlos Lagos-Martinez, the man whom Agent Marin testified had introduced him to Craig Calver.[7] The prosecuting attorney took the bait and, when his turn came, responded, "Mr. Lagos-Martinez is in jail"—a fact that had never been introduced into evidence. All three defense counsel immediately objected and moved for a mistrial. The Judge denied the motion, but carefully instructed the jury to disregard the prosecutor's remark.

Appellants contend that this reference to a fact not in evidence was so improper and highly prejudicial that they were deprived of a fair trial, notwithstanding the curative instructions given by the Trial Judge. We disagree.

We acknowledge that the comment in question was improper, and we recognize that improper statements by prosecutors in summation is a recurring problem in this Court. But several factors militate against finding reversible error in this case. The infelicitous remark was not uttered out of the blue. Rather, it was made in response to the closing argument of Calver's attorney. This fact alone does not, of course, exonerate the prosecutor, but it does tend to absolve him of any prejudicial intent that might otherwise warrant our reprobation in the form of a reversal under our supervisory powers regardless of whether any prejudice in fact occurred.

Furthermore, not only does the record indicate that the remark was devoid of prejudicial intent, but we also are unable to conclude that it had any prejudicial effect.

---

*Apollo* nor the *James* revision is material to any of the issues raised by appellants in this case.

**6.** Cf. *United States v. Crockett,* 5 Cir., 1976, 534 F.2d 589, 599; 4 Weinstein's Evidence ¶ 801(d)(2)(E)[01], at 801–148 n. 28 (J. Weinstein & M. Berger, 1976). Extrajudicial statements made by a defendant will usually be admissible against him to show his knowing participation in a conspiracy under one or more Federal Rules—*e. g.,* F.R.Evid. 801(d)(2)(A) (personal admission); F.R.Evid. 803(3) (statement of then existing state of mind); F.R.Evid. 803(6) (records of regularly conducted activity); F.R.Evid. 804(b)(3) (statement against interest).

**7.** The relevant portions of the argument by Calver's attorney are as follows:

> Where is this Mr. Carlos Lagos-Martinez? Where is he? Where is this informant that the Government said was there? Why wasn't he put on the stand to corroborate the agent's testimony?
>
> I am not saying that the agent is lying, obviously not. That is not the issue. The issue is that it is uncorroborated.
>
> *     *     *     *     *     *
>
> Why wasn't Carlos Lagos-Martinez brought in? He was not indicted in this case.

Prejudice would have occurred only if the jurors made the broad inferential leap from the mere statement that a relatively minor figure in the events recounted at trial was in jail to the conclusion that he was in jail because of his participation in those same events and that therefore the defendants must also be guilty. We seriously doubt whether the jurors would have drawn such an inference even in the absence of any curative instructions. And since ample instructions to disregard were in fact given, we are satisfied beyond any doubt that the defendants were not unfairly prejudiced by the remark. *See generally United States v. Morris,* 5 Cir., 1978, 568 F.2d 396, 401–02.

### IV. Behind The Scenes: A Bungled Investigation

The remaining two errors that the appellants join in asserting relate specifically to witness Robin Ehrlich and the testimony she gave. Consideration of these two purported errors requires us to examine in some detail aspects of this case that were not included in our account of the evidence before the jury.[8]

On August 1, 1977, shortly after Calver and Perry had been arrested and while they were being interrogated by numerous agents inside Calver's apartment, Valerie Fredericks and Robin Ehrlich appeared at the door of Calver's apartment and were invited inside by one of the agents. Because the behavior of the women indicated that they were familiar with Calver and Perry, the agents began to question them as well. Robin Ehrlich was led into a separate room and, according to her uncontroverted testimony, subjected to threatening and heavy-handed interrogation concerning the whereabouts of the quaaludes and whether she used drugs. As several Government agents later testified, she was extremely upset that her boyfriend Leon Perry had been arrested and, presumably, that she too was being detained. One of the agents advised her that the best thing she could do

under the circumstances was to cooperate with the Government. Ehrlich then admitted that the quaaludes were in the apartment that she shared with Perry and that they had been brought there in a suitcase by Valerie Fredericks. Subsequent testimony given by the various Government agents was inconclusive concerning whether Ehrlich had been given any *Miranda* warnings prior to this interrogation, even though she was, according to one officer's testimony, under arrest and it was manifestly clear to all, including Ehrlich herself, that she was not free to leave.

The agents asked Ehrlich to lead them to Perry's apartment, telling her that if she refused to do so she would go to jail. She complied with this veiled threat. The door to Perry's apartment was locked, however, and Ehrlich did not have her key. Pressed by the agents, Ehrlich told them that Perry would have a key to the apartment. One of the agents warned her: "You had better not be lying to us, because if we have to get a search warrant, and we have to go through the trouble of that, it is going to be hard on you. You are going to go to jail for sure." Two of the agents returned to Calver's apartment where Perry was still being detained, and, without his consent and while he was handcuffed, removed his keys from his pantspocket. The agents returned with the key to Perry's apartment (where Ehrlich had remained in the custody of another agent), gave the key to Ehrlich, and ordered her to open the door. She obeyed and they entered the apartment. Inside, the agents found a man whom they arrested and subsequently released as well as the suitcase which Ehrlich had stated had been brought to the apartment by Fredericks. The agents opened the suitcase, revealing the quaaludes wrapped in aluminum foil.

The agents handcuffed Ehrlich and took her to a DEA office for processing. At the DEA office, an agent read the *Miranda* warnings to Ehrlich, she waived her rights,

---

**8.** This second and concluding chapter in our tale of the quaalude quagmire has been drawn from the transcript of a suppression hearing before a United States Magistrate and the transcript of several hearings held outside the presence of the jury during the trial itself.

and she gave a complete account of her knowledge of the quaalude activities of Calver, Perry, and Fredericks. Ehrlich later testified that this was the first time she was advised of her *Miranda* rights, and the Government never was able to establish otherwise. Indicative of the confused and haphazard treatment accorded Ehrlich is the fact that no two Government agents ever agreed about the precise time at which she was arrested.

Calver, Perry, and Fredericks subsequently were indicted both for conspiracy to distribute quaaludes and for possession of quaaludes with intent to distribute, while Robin Ehrlich assumed the status of an unindicted coconspirator. Prior to trial, the three defendants moved to suppress the quaaludes. Ehrlich was subpoenaed to testify at the suppression hearing and was told that if she failed to testify she would be arrested. Before testifying, she asked an Assistant United States Attorney if she could bring an attorney with her and was told that while she could, he did not think she would need an attorney. Without ever having consulted a lawyer of her own, she gave testimony at the suppression hearing incriminating all three defendants.

After hearing her testimony and that of two police officers, the Magistrate ruled that the warrantless entry of Perry's apartment had been effected without the consent of either Perry or Ehrlich and was therefore improper. He also ruled that the warrantless search of Fredericks' suitcase was improper. In accordance with these rulings, he recommended suppression of the quaaludes as evidence against Perry and Fredericks.

The District Judge adopted the findings of the Magistrate and granted the motion to suppress the quaaludes as to Perry and Fredericks. As a result, the Government, during the trial, agreed to drop the substantive count against all three defendants, including Calver.

Each of the defendants then proceeded to challenge the testimony of Robin Ehrlich, who figured to be a crucial, if reluctant, witness for the prosecution. This motion to suppress her testimony was based on the ground that the Government had initially obtained her testimony without giving her *Miranda* warnings and as a result of an illegal search and arrest. The District Judge denied the motion, ruling that "[a]ny alleged illegal arrest or interrogation of Robin Ehrlich * * * cannot inure to the benefit of the defendants."

Before Ehrlich actually testified at trial, however, she attempted, through counsel specially appointed to represent her at trial, to assert a Fifth Amendment privilege against testifying. She argued that she had not testified voluntarily at the suppression hearing, nor was her appearance at trial a voluntary one. She admitted that she had not been granted any immunity, but she claimed that she had been promised that she would not have to testify against her boyfriend, Leon Perry. The District Judge ruled that her testimony at the suppression hearing had been given voluntarily and that in giving that testimony she had waived her Fifth Amendment privilege. He therefore ordered her to testify or be held in contempt.

Shortly after the Government began its direct examination of Ehrlich, she realized her testimony was being admitted against Leon Perry. She protested, citing her agreement with the Government that no evidence would be elicited from her concerning Leon Perry. The Government acknowledged the agreement, and all three defendants moved for a mistrial. The District Judge denied the motion, observing that any agreement between the Government and Ehrlich was not binding upon the Court and that as far as he was concerned the defendants would have the usual latitude to cross-examine within the ambit of the direct and would be free to develop anything in the nature of impeachment. When direct examination of Ehrlich resumed, she gave the testimony reported above.

## V. Right Of Confrontation

Of the two objections appellants raise to Robin Ehrlich's testimony, one bor-

ders on the frivolous. Despite the fact that the Trial Judge expressly refused to give any deference to the agreement between the Government and Robin Ehrlich concerning the scope of her testimony, appellants argue that they were denied their Sixth Amendment right of confrontation by virtue of that agreement.[9] The record reveals, however, that the appellants had a full, fair, and meaningful opportunity to cross-examine Ehrlich both as to matters she testified to on direct and as to her agreement with the Government and its underlying motivation—her desire to avoid prosecution herself and to minimize the consequences of prosecution for her boyfriend, Leon Perry. *Cf. United States v. Onori,* 5 Cir., 1976, 535 F.2d 938, 945. Thus, far from being infringed, appellants' right of confrontation was fully honored and protected.[10]

## VI. Suppression, Tainted Fruit, And Standing

Appellants' other objection to the testimony of Robin Ehrlich is somewhat more substantial, though ultimately no more meritorious. Appellants argue that Ehrlich's testimony should have been excluded in its entirety on four grounds: (1) it was obtained antecedent to, and as a consequence of, an illegal search; (2) it was obtained pursuant to an illegal arrest; (3) it was elicited from Ehrlich in derogation of the *Miranda* precepts;[11] and (4) it was compelled at trial in violation of Ehrlich's Fifth Amendment privilege against self-incrimination.

The only one of these asserted violations that appellants may properly urge in their own defense as grounds for the suppression of Ehrlich's testimony is the first—that her testimony was the result of an illegal search in violation of Perry's and Fredericks' Fourth Amendment rights. Despite the Government's contentions, there is no question but that the warrantless search of Perry's apartment and Fredericks' suitcase was unconstitutional,[12] and that the subsequently seized quaaludes could not be used as evidence against Perry or Fredericks. Nor is there any question but that the exclusionary rule applies not only to evidence actually seized in an illegal search, but also to evidence located as a result of information obtained in an illegal search, *i. e.,* to evidence that is, according to the somewhat tiresome legal argot, the "fruit of the poisonous tree." *E. g., Wong Sun v. United States,* 1963, 371 U.S. 471, 484–88, 83 S.Ct. 407, 9 L.Ed.2d 441; *Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319.[13] Further, it is clear that verbal evidence as well as physical evidence may be the tainted fruit of an unlawful search and therefore suppressed. *E. g., United States v. Ceccolini,* 1978, 435 U.S. 268, 275, 98 S.Ct. 1054, 55 L.Ed.2d 268; *Wong Sun, supra,* 371 U.S. at 485–86, 83 S.Ct. 407.

---

9. Oddly enough, Leon Perry joins in this argument.

10. Indeed, Robin Ehrlich answered whatever questions concerning Leon Perry or her cooperation with the Government the defense attorneys asked her.

11. *See Miranda v. Arizona,* 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

12. The Government fell far short in meeting its burden of proving that either Perry or Ehrlich had freely and voluntarily given their consent to the search of Perry's apartment, *see Schneckloth v. Bustamonte,* 1973, 412 U.S. 218, 233, 93 S.Ct. 2041, 36 L.Ed.2d 854; *Bumper v. North Carolina,* 1968, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797, and it has never even claimed that the DEA agents opened Fredericks' suitcase with her consent.

13. There are, however, two important exceptions to the "fruit of the poisonous tree" branch of the exclusionary rule. Even if the Government acquires evidence indirectly through an illegal search, illegal arrest, or illegal interrogation of a defendant, that evidence need not be excluded (1) if the substance of the tainted evidence is subsequently discovered or acquired through an independent source, or (2) if the causal connection between the indirectly acquired evidence and the Government's unlawful conduct has "become so attenuated as to dissipate the taint." *See generally Wong Sun, supra,* 371 U.S. at 487–88, 83 S.Ct. 407; *Parker v. Estelle,* 1974, 5 Cir., 498 F.2d 625, 629, *cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450.

But to grant appellants these points does not compel the conclusion that Robin Ehrlich's testimony should have been suppressed. The fatal flaw in the appellants' argument is that the "fruit of the poisonous tree doctrine" is simply inapplicable in this context. Assuming that Ehrlich's testimony was in fact the "fruit" of governmental conduct, it was the fruit of actions *other* than the illegal entry into Perry's apartment. The DEA officers, for example, had ascertained Ehrlich's identity, her relationship with Leon Perry, and the crucial element of her testimony—that a suitcase containing quaaludes had been brought to Perry's apartment by Valerie Fredericks—*before* their unconstitutional search of Perry's apartment. To the extent that the illegal search was the source of evidence against the appellants (namely, the suitcase and the quaaludes), the exclusionary rule was properly and fully applied. For the rule to be extended to encompass and exclude Ehrlich's testimony as well, appellants must show that it was by some other violation of their constitutional rights that the Government secured and introduced that testimony.

The evidence in the record is inconclusive, but it does suggest that there were indeed other constitutional violations in this case connected with the testimony Robin Ehrlich ultimately gave at trial. While there most likely was probable cause to support the arrest of Ehrlich, the evidence indicates that she was subjected to at least one custodial interrogation without having been advised of her *Miranda* rights. Moreover, Ehrlich's assertion of her Fifth Amendment privilege against self-incrimination may very well have been erroneously overruled by the Trial Judge. But whether or not Ehrlich's rights were infringed by her arrest, her interrogation, or the compulsion of her testimony is immaterial to this appeal. For the simple fact of the matter is that *appellants'* rights were not violated by any of those governmental acts and therefore suppression of Ehrlich's testimony is not required to protect or vindicate their rights.

The Supreme Court expounded upon this principle that defendants do not have "standing" to assert in their own defense the denial of certain constitutional rights to others in *Alderman v. United States,* 1969, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, a case which involved a claim that all incriminating evidence obtained through an illegal wiretap should be suppressed against all defendants, even those who were not parties to the bugged conversations:

> The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence. Coconspirators and codefendants have been accorded no special standing.
>
> \*    \*    \*    \*    \*    \*
>
> We adhere \* \* \* to the general rule that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted. \* \* \* None of the special circumstances which prompted *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), are present here. There is no necessity to exclude evidence against one defendant in order to protect the rights of another. No rights of the victim of an illegal search are at stake when the evidence is offered against some other party. The victim can and very probably will object for himself when and if it becomes important for him to do so.

394 U.S. at 171–74, 89 S.Ct. at 965–67.

Although *Alderman* and most other "standing" cases have involved Fourth Amendment violations, the principle has also been applied where, as in this case, one codefendant or coconspirator seeks to suppress evidence incriminating him that was obtained from a coparticipant in crime without proper compliance with the procedural requirements of *Miranda* or otherwise in violation of that party's Fifth or Sixth Amendment rights. *E. g., Gissendanner v.*

*Wainwright,* 5 Cir., 1973, 482 F.2d 1293, 1296–97; *United States v. Pruitt,* 9 Cir., 1972, 464 F.2d 494, 495; *United States v. Schennault,* 7 Cir., 1970, 429 F.2d 852, 855; *United States v. Bruton,* 8 Cir., 1969, 416 F.2d 310, 312–13, *cert. denied,* 1970, 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428. Similarly, at trial, a defendant can neither assert the Fifth Amendment right against self-incrimination on behalf of a witness, nor, if the witness himself asserts his privilege, take advantage of an error of the court in overruling it. *See, e. g., United States v. Colyer,* 5 Cir., 1978, 571 F.2d 941, 945; *Hall v. United States,* 5 Cir., 1969, 413 F.2d 45, 48; *United States v. Skolek,* 10 Cir., 1973, 474 F.2d 582, 584–85; *Bowman v. United States,* 9 Cir., 1965, 350 F.2d 913, 915–16, *cert. denied,* 1966, 383 U.S. 950, 86 S.Ct. 1209, 16 L.Ed.2d 212.

■ By holding that appellants are not entitled to suppression of Ehrlich's testimony because of probable governmental violations of her rights, we do not sanction gross police misconduct against third parties in the overly zealous pursuit of criminal convictions. To use an extreme example, the prosecution certainly would not be allowed to admit statements wrung from one of four criminal suspects through torture and unremitting prolonged interrogation in the trial of the other three suspects.[14] In this case, however, the actions of the DEA officers, even if viewed in the worst possible light, were a far cry from the sort of third-degree physical or psychological coercion that might prompt us to disregard altogether the societal interest in law enforcement by excluding the highly probative testimony of a nondefendant.[15] Nor is there the

slightest indication in the record that the reliability of Ehrlich's testimony, however involuntarily given, was at all suspect. Indeed, her story was consistent and persuasive throughout—from the time of the arrests, through the suppression hearing, up to and including trial.

Appellants' right to a fair trial was not prejudiced by the introduction of this reliable and relevant testimony. Nor were any other of their rights violated by the manner in which the Government obtained that testimony. They have nothing about which to complain except their own indiscretion in dealing in quaaludes.

AFFIRMED.

---

**14.** *Cf. Bradford v. Johnson,* E.D.Mich., 1972, 354 F.Supp. 1331, *aff'd,* 6 Cir., 1973, 476 F.2d 66; *see also LaFrance v. Bohlinger,* 1 Cir., 1974, 499 F.2d 29, *cert. denied,* 1974, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674; *United States v. Payner,* N.D.Ohio, 1977, 434 F.Supp. 113. The objection to the introduction of statements extracted from a nondefendant by extreme coercion and inquisitional tactics is two-fold. First, there is the distinct possibility that the jurors will be captivated by the high degree of relevance such statements often possess and will fail to take into account the increased likelihood that the statements are unreliable. Second, the use of statements derived through

shocking and intentional police misconduct offends the fundamental fairness essential to due process of law.

**15.** *Cf. United States v. Janis,* 1976, 428 U.S. 433, 448–49, 96 S.Ct. 3021, 49 L.Ed.2d 1046; *Michigan v. Tucker,* 1974, 417 U.S. 433, 450–51, 94 S.Ct. 2357, 41 L.Ed.2d 182; *Nardone v. United States,* 1939, 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 ("Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land.").