**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Harvey Kelly SIMS,**
**Defendant–Appellant.**

**No. 87–8216.**

United States Court of Appeals,
Eleventh Circuit.

May 27, 1988.

Richard Sherman, Santa Monica, Cal., for defendant-appellant.

William H. McAbee, II, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before JOHNSON and HATCHETT, Circuit Judges, and ESCHBACH[*], Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this major drug importation conspiracy case, we affirm the district court's rulings on motions for recusal, dismissal of the indictment, and suppression of evidence.

### FACTS

Harvey Kelly Sims, the appellant, operated an elaborate drug smuggling enterprise in south Georgia. The Sims organization successfully imported three aircraft loads of cocaine from Colombia, South America. Sims, a licensed pilot, personally flew the aircraft and imported approximately 2,000 pounds of cocaine. The testimony of the government's key witnesses, Rick Jarriel and Mark Olsen, established that Sims hired ground personnel to assist in preparing aircraft landing strips and in transporting and storing cocaine at designated locations. The organization had a corporate-like command hierarchy. Sims commissioned Wayne Strange, a co-defendant, to secure crews for off loading the narcotics. "Dummy" corporations existed in Georgia, Florida, Panama, and Delaware and were used to purchase aircraft and vehicles to assist in the off loading process. State of the art electronic equipment such as sophisticated navigational equipment, landing

---

[*] Honorable Jesse E. Eschbach, Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

lights, and night vision goggles were commonplace to this operation. The organization purchased an eighty-acre tract of land in an unpopulated area of Tattnall County, Georgia, for use as a landing strip and purchased property in Candler County, Georgia, to store cocaine prior to distribution.

The organization amassed substantial funds during this enterprise. Wayne Strange testified that he received payments in excess of $140,000 for his assistance in the operation. Rick Jarriel testified to finding $175,000 wrapped in a plastic bag in a pig pen at Wayne Strange's house which the pigs had apparently uprooted. Also, Sims made a cash deposit of $170,000 in a Panamanian bank just prior to his arrest.

## PROCEDURAL HISTORY

A federal grand jury in the Southern District of Georgia indicted Sims, along with others, on a ten-count indictment for violation of federal narcotics laws, pursuant to 21 U.S.C. § 848. The indictment charged: (1) four counts of possession with intent to distribute cocaine; (2) four counts of importation of cocaine; (3) one count of conspiracy to import cocaine; and (4) one count of conspiracy to distribute cocaine. The grand jury also named Sims in a forfeiture count, pursuant to 21 U.S.C. § 853. Sims filed pretrial motions to suppress evidence, to dismiss the indictment, and for recusal of the district court judge. The district court denied the motions. The district court also ordered the lawyers in the case to answer interrogatories regarding payment of attorney's fees. After objecting, Sims's lawyer responded to the interrogatories. Sims then renewed his motions for recusal of the district court judge and dismissal of the indictment. Again, the district court denied the motions.

On January 28, 1987, a jury found Sims guilty on all ten counts of the indictment. On Count I, the district court sentenced Sims to a term of life imprisonment, without parole, under the continuing criminal enterprise statute and fined him $100,000. On Counts II–IX, the district court sentenced Sims to concurrent 40–year terms consecutive to the life term. The district court also imposed a $500,000 fine and held Sims's property forfeited to the government.

The issues before this court are: (1) whether the district court erred in failing to dismiss the indictment; (2) whether the district court erred in denying Sims's motion for recusal; and (3) whether the affidavit filed in support of the search warrant is sufficient.

In order to understand Sims's arguments concerning alleged governmental misconduct, we must analyze the relationship between the government's key witness, Mark Olsen, agents of the Drug Enforcement Administration (DEA), and other co-conspirators. This requires examination of two prior cases involving several of the co-conspirators in this case.

## BACKGROUND

### Middle District of Georgia Case

A grand jury in the Middle District of Georgia charged Mark Olsen, an informant, with importation of cocaine from Colombia, South America. The grand jury also charged co-defendants Andrade, Rua, Hurtado, and DePablos–Soto in this venture. Ed Garland and John Nuckolls, lawyers, represented these defendants in the Middle District of Georgia case and represented them in this case.

On February 2, 1986, Mark Olsen pleaded guilty in the Middle District of Georgia case and received a sentence of twelve years imprisonment. Richard Hagler, a lawyer, represented Olsen in that case. After Olsen's conviction, the government granted Olsen immunity and served upon him a compulsion order to give testimony before a grand jury in Macon, Georgia, concerning this case. Olsen refused to comply, and the district court in the Middle District of Georgia found him in contempt.

### Southern District of Georgia Case

On April 17, 1986, a federal grand jury in the Southern District of Georgia indicted Olsen on a seven-count indictment charging

possession of false identification and illegal use of a communication facility. The indictment charged that Olsen used false birth certificates and false aircraft pilot's licenses during his participation in offenses charged in this case. As in the Middle District of Georgia case, Richard Hagler represented Olsen.

### The Conference

Olsen's involvement in drug importation enterprises prompted a meeting in the United States Attorney's Office in Macon, Georgia, on May 14, 1986. Hagler represented Olsen and discussed conditions under which Olsen would become a cooperating informant and supply information concerning cocaine importation into middle and southern Georgia. The parties were unable to reach an agreement.

### The Trip

Drug enforcement agents Keller and Frye transported Olsen from Savannah to the Macon meeting. In route to Macon, the agents detoured, taking Olsen to locations in Southern Georgia where the agents believed the organization had cocaine storage sites prior to Olsen's arrest in August, 1985. The agents' intent was to show Olsen the locations in order to convince him of how much the agents knew of the operation so that Olsen would cooperate with their investigations. At this point, a dispute exists as to whether the agents offered to Olsen a recommendation that the court impose a sentence of six years. Olsen contends that the agents stated they would recommend such a sentence. The agents denied making the promise.

### Letters

On July 16, 1986, Olsen entered a guilty plea to the false identification charge in the Southern District of Georgia. While awaiting sentencing, Olsen wrote numerous letters to federal agencies, including the Drug Enforcement Administration, indicating that he wanted to cooperate with the government. Olsen had become disillusioned with his lawyer (Hagler) because of the lawyer's failure to reach an agreement with the government. As a result of the letter Olsen sent to their agency, drug enforcement agents Frye and Keller visited Olsen on two occasions without his lawyer's knowledge. At these meetings, the agents told Olsen that his lawyer was not working in his best interest, and Olsen stated his concern about his lawyer's real intent.

When asked about the basis for his concern, Olsen stated that after his arrest in the Middle District of Georgia, Lance Smith, a lawyer, told him that Sims would provide a lawyer for him. Smith also advised Olsen that Sims would take care of all attorney's fees and assist in any way possible. Smith informed Olsen that he had arranged for Hagler to represent him, and that Sims paid substantial sums of money to Hagler, in addition to what Olsen's parents were paying for his representation. Smith assured Olsen that Sims would provide financial support if he were sentenced to a term of imprisonment. Smith also advised Olsen about the case status of Gary Scott and the Mock brothers. Although Sims was not indicted in the Scott case, all of the government's discovery materials given to Scott's lawyer were seized at Sims's Miami residence. Moreover, evidence seized at Wayne Strange's house, a co-defendant in this case, revealed that a series of payments had been made for all lawyers in the Middle District of Georgia case, totaling $300,000. The lawyers listed as receiving payments were Hagler, Smith, Brogdon, and Garland. These lawyers had been associated with co-defendants in Sims's present case as well as the Middle District of Georgia case.

### *In Camera*

As stated earlier, Olsen told the DEA agents that he wished to negotiate with the government directly and without assistance from his lawyer, Hagler. To accomplish this, the government agents brought Olsen before the district court for an *in camera* proceeding without the knowledge of Hagler. The purpose of the hearing was to advise Olsen regarding his right to counsel

and to obtain the court's approval for Olsen to personally negotiate with the government. Olsen confirmed his concern to the district court that Hagler was not adequately representing him. After the meeting, the government agents advised Olsen not to discuss the *in camera* meeting with Hagler.

On August 21, 1986, Olsen entered into a cooperation agreement with the government. As part of the agreement, the government asked Olsen to investigate the lawyers in the Columbus case (M.D.Ga.) regarding a possible obstruction of justice scheme. This information became a matter of common knowledge to all of the lawyers and the defendants in this case.

On December 9, 1986, the district court directed the lawyers in this case to divulge the sources of their fees. The court stated that this fee information was necessary in order to properly qualify the jury and to alleviate any possible conflicts of interest. To this directive, the lawyer for Sims, Sherman, and another lawyer, Garland, vehemently objected to divulging the information. Sims's lawyer also alleges that he suffered physical intimidation from a deputy of the United States Marshal's Office when he approached the court in reference to the fee information directive. Sims filed motions to dismiss the indictment and moved for recusal of the district court judge in this case because of the *in camera* proceeding. The district court denied Sims's motions. Numerous affidavits were filed expressing breach of the attorney-client relationship among the various defendants and lawyers in this case.

## DISCUSSION

Sims asserts a sixth amendment violation because of the government's alleged improper contact with co-conspirator Olsen. The district court held for the government finding that any "alleged governmental misconduct arising from activities which may have abridged Mark Olsen's rights do not justify dismissal of the indictment against other defendants."

■ After his Columbus conviction, Olsen became disillusioned with his lawyer's representation and gave the government information used to convict Sims. The purpose of the *in camera* hearing was to inform Olsen of his right to counsel and obtain the court's approval for Olsen's direct negotiations with the government. We find no error in this process. Indeed, Olsen solicited the government's assistance and sought to negotiate with the government for a favorable disposition of his case. This is not the manner in which the government usually handles informants and conducts court proceedings; but, with the increase in lawyer participation in unusual arrangements with clients in drug cases, unusual proceedings and remedies are appropriate.

■ Even if the agents' actions violated Olsen's right to counsel, Sims has no standing to assert this claim. This circuit has held that defendants do not have standing to assert in their own defense the denial of constitutional rights to others. *Wilcox v. Ford*, 813 F.2d 1140, 1148 n. 13 (11th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 287, 98 L.Ed.2d 247 (1987); *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979); *see also Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Sims cannot benefit from alleged constitutional violations personal to Olsen.

### Attorney's Fees

■ Sims also contends that the district court's inquiry regarding attorney's fees violated his sixth amendment rights. This circuit has consistently held that matters involving the receipt of fees from a client are not generally privileged. *In re Grand Jury Investigation, Harvey*, 769 F.2d 1485 (11th Cir.1985); *In re Slaughter*, 694 F.2d 1258, 1260 (11th Cir.1982); *In re Grand Jury Proceedings: United States v. Jones*, 517 F.2d 666 (5th Cir.1975). An exception to this general rule exists where the disclosure of fee information would give the identity of a previously undisclosed client/suspect. *In re Grand Jury Investigation, Harvey*, 769 F.2d at 1487; *In re*

*Grand Jury Subpoena, Slaughter,* 694 F.2d at 1260. This case does not fall within the exception. We note that the lawyer's responses to the district court's directive did not require the identity of a previously undisclosed client/suspect. Indeed, the government knew the identities of the lawyers and clients. "The attorney-client privilege exists to protect confidential communications between client and lawyer made for the purposes of securing legal advice, and will not be violated by disclosure in this case." *In re Slaughter,* 694 F.2d at 1260.

The government presented probative evidence to the district court regarding payment of attorney's fees which indicated possibilities of collusion and conflicts of interest. At the hearing, Olsen testified about the conversation with Smith during which he was told that Sims would pay all his attorney's fees, that Smith had arranged for Hagler to represent him, and that Sims provided substantial compensation for the representation. Further, the evidence indicated that Sims possessed discovery materials in his Miami residence with reference to prior cases in the Southern District of Georgia involving Scott, and the Mock brothers. Although Sims was not indicted in the Scott case, Sims was privy to discovery information released to Scott's lawyer. Scott, a co-conspirator in this case, and the Mock brothers were participants in Sims's drug-related activities. Moreover, agents seized notes at co-conspirator Wayne Strange's house indicating a series of payments made through Strange for all lawyers in the Middle District of Georgia case totalling $300,000. These lawyers were associated with co-conspirators in this case as well as the Middle District of Georgia case. Before issuing its directive, the district court was cognizant of the fact that Smith and Brogdon represented Gary Scott and the Mock brothers in the Southern District of Georgia case and that discovery information provided them had been seized in Sims's Miami residence. Given these circumstanc-

es, the district court was justified in inquiring as to the source of attorney's fees.

■ We reject Sims's assertion that the government must establish a *prima facie* showing that the information sought is relevant to its investigation. This court has consistently held that "no such showing of relevance is required in this circuit." *See In re Slaughter,* 694 F.2d at 1260; *In re Grand Jury Investigation (Patricia McLean),* 565 F.2d 318 (5th Cir.1977). The government's showing in this case is adequate. The record clearly indicates that lawyers representing co-defendants in this case also represented defendants in a previous case and that Sims provided fees to all counsel in the previous case even though he was not a party in the previous case. The appearance of impropriety and possible conflicts of interest are pervasive in this case, thereby warranting the district court to inquire as to the source of attorney's fees.

■ Moreover, Sims's alleged sixth amendment violation does not warrant dismissal of the indictment absent a showing of demonstrable prejudice. *See United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 668, 66 L.Ed.2d 564 (1981); *United States v. Melvin,* 650 F.2d 641 (5th Cir. Unit B 1981).[1] Although federal courts possess the authority to dismiss an indictment for governmental misconduct, dismissal is an "extreme sanction which should be infrequently utilized." *United States v. Pabian,* 704 F.2d 1533, 1536 (11th Cir.1983) (quoting *U.S. v. Owen,* 580 F.2d 365, 367 (9th Cir.1978)). Dismissal is only favored in the most egregious cases. "Cases involving sixth amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Morrison,* 449 U.S. at 364, 101 S.Ct. at 667–68.

■ In this case, Sims has failed to support his motion for dismissal of the indictment under the *Morrison* standard. We

---

1. In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this court adopted as precedent all Unit B decisions of the former Fifth Circuit.

find no prejudice or injury to Sims. We note that the government did not call Mark Olsen at trial to give testimony against Sims. On the contrary, Sims called Olsen to elicit testimony concerning Olsen's contact with the government in an effort to convey possible governmental misconduct to the jury. In essence, Sims intended to benefit from any constitutional claim Olsen may have been entitled to. As stated earlier, defendants do not have standing to assert in their own defense the denial of constitutional rights to others. *Wilcox*, 813 F.2d at 1148 n. 13; *Fredericks*, 586 F.2d 470 (5th Cir.1978). Also, Sims's contention that prejudice resulted from investigations and inquiries concerning the source of attorney's fees is without merit. The court made inquiries regarding attorney's fees before trial. None of these claims would have been before the jury if Sims had not called Olsen to testify about them. Likewise, we find no prejudice from Sims's allegations of U.S. Marshal intimidation during the hearing. Again, no physical contact occurred, and the jury was not present during this confrontation. Thus, the district court correctly denied Sims's motion to dismiss.

### Recusal

■ Sims also contends that because the district judge inquired into attorney's fees and conducted the *in camera* hearing, these activities established sufficient prejudice or bias to warrant the district judge's recusal. In *United States v. Meester*, 762 F.2d 867 (11th Cir.), *cert. denied*, 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985), the district court denied Meester's motion to dismiss because of alleged bias and lack of impartiality. This court held that an allegation of bias sufficient to require recusal must demonstrate that the alleged bias is personal as opposed to judicial in nature.

"The alleged bias 'must stem from an extra-judicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *Meester*, 762 F.2d at 884 (quoting *United States v. Clark*, 605 F.2d 939, 942 (5th Cir.1979) (per curiam)). "An exception to the general rule that the bias must stem from an · extrajudicial source exists where 'such pervasive bias and prejudice is shown by otherwise judicial conduct as would constitute bias against a party.'" *Meester*, 762 F.2d at 867 (quoting *Davis v. Board of School Commissioners*, 517 F.2d 1044, 1051 (5th Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976). Recusal is predicated on two statutes which govern federal district judges on the grounds of bias, prejudice, or lack of impartiality. 28 U.S.C. §§ 144, 455.[2]

In this case, Sims has failed to demonstrate the requisite personal bias. The district court judge learned of the questions concerning attorney's fees in his judicial capacity. The district court judge's directive concerning the source of attorney's fees and the conducting of the *in camera* hearing were of a judicial, rather than a personal, nature. The intent of these proceedings was to discover possible conflicts of interest, advise Olsen of his right to counsel, and to properly instruct the jury. The record is replete with circumstances justifying the district court's denial of recusal.

### Search Warrant

■ In this case, Sims asserts that the agents made deliberate false statements to the court in order to secure a search warrant. We hold that the affidavit in support of the search warrant is sufficient. In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct.

---

**2.** Title 28 U.S.C. § 144 provides, in pertinent part:

· Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge ... has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein....

Title 28 U.S.C. § 455 provides, in pertinent part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he has a personal bias or prejudice concerning a party....

2674, 57 L.Ed.2d 667 (1978), the Supreme Court addressed the issue of whether "a defendant in a criminal proceeding ever [has] the right under the Fourth and Fourteenth Amendments ... to challenge the truthfulness of factual statements made in an affidavit supporting [a] warrant." *Franks*, 438 U.S. at 155, 98 S.Ct. at 2676. The Supreme Court held that where a defendant makes a preliminary showing that: (1) an affiant knowingly and intentionally included a false statement in an affidavit, or (2) made the false statement with reckless disregard for its truth, and (3) the false statement was necessary to the finding of probable cause, then constitutional mandate requires that a hearing be held at the defendant's request. *Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. *See United States v. Haimowitz*, 706 F.2d 1549, 1556 n. 2 (11th Cir.1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984); *United States v. Astroff*, 578 F.2d 133 (5th Cir.1978) (in banc).[3] "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine." *Franks*, 438 U.S. at 171, 98 S.Ct. at 2684.

■ Even if this court were to eliminate statements alleged to be false, Sims has failed to satisfy the third prong of *Franks* because sufficient allegations in the warrant affidavits remain to support a finding of probable cause. *See Franks*, 438 U.S. at 171–72, 98 S.Ct. at 2684–85. The affidavit contains information concerning Sims's smuggling operation and is based on first-hand information provided by the government's key witnesses. The affidavit contains information indicating Sims's direct involvement in the scheme. Independent police investigation verified telephone calls between Sims and other members of the conspiracy, thereby corroborating Rick Jarriel's testimony. Jarriel had direct involvement in the scheme and implicated Sims in the cocaine smuggling operation. Investigation also revealed Sim's use of aircraft and landing equipment to facilitate

narcotics importation. The unchallenged statements of Jarriel and the independent police investigation clearly establish a finding of probable cause under the third prong in *Franks*. "Insignificant and immaterial misrepresentations or omissions will not invalidate a warrant." *U.S. v. Ofshe*, 817 F.2d 1508, 1513 (11th Cir.), *cert. denied*, — U.S. ——, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987) (citing *Franks*, 438 U.S. at 165, 98 S.Ct. at 2681). We find that the issuing judge "had a substantial basis for ... concluding that probable cause existed." *See Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1982). Sims's attempt to question the sufficiency of the warrant and the denial of his request for an evidentiary hearing lacks merit.

Accordingly, the district court's convictions and judgments are affirmed.

AFFIRMED.

---

**3.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (in banc), the Eleventh Circuit Court of Appeals adopted as precedent the deci-

sions of the former Fifth Circuit issued before October 1, 1981.