[Cite as *State v. Rice*, 2019-Ohio-1415.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NOS. 2018-L-065**<br>**2018-L-066** |
| JIMMIE D. RICE, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeals from the Lake County Court of Common Pleas, Case Nos. 2017 CR 001388 and 2017 CR 001334.

Judgment: Affirmed.


*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*David E. Koerner*, Law Office of David E. Koerner, 5900 SOM Center Road, Suite 12-146, Willoughby, OH 44094 (For Defendant-Appellant).


MARY JANE TRAPP, J.

{¶1} Appellant, Jimmie D. Rice, Jr. ("Mr. Rice), appeals from the judgments of the Lake County Court of Common Pleas, which sentenced him to an aggregate mandatory 9-year and 36-month prison term. A jury found Mr. Rice guilty on 13 counts out of 14 counts that arose from two separate domestic violence incidents involving the same victim.

{¶2} After a review of the record and pertinent law, we affirm the trial court's judgment. We find Mr. Rice has no standing to assert a claim that his victim's Marsy's Law rights were violated when the trial court failed to grant her request for court-appointed counsel. Nor do we find compelling the argument that the trial appearance of a victim-witness in his case equated to coerced trial testimony that compromised Mr. Rice's due process rights. The findings below were supported by sufficient evidence, and the judgment was not against the manifest weight of the evidence. We also find Mr. Rice's assertion that trial counsel was ineffective by not being present during his grand jury testimony without merit. There is no evidence that had counsel been present, Mr. Rice would not have been indicted and then later found guilty.

### Substantive and Procedural History

{¶3} This appeal originates from two separate cases, Case No. 2017-CR-001334 and Case No. 2017-CR-001388, which were consolidated and tried together before a jury. Mr. Rice timely appealed each judgment, which we have consolidated for our review.

### *The One-Stop Gas Station Altercation - Case No. 2017-CR-001334*

{¶4} In the late evening of November 11, 2017, the Painesville police were dispatched to the Painesville One Stop Gas Station located on Liberty Street and W. Washington Street for a disturbance between a man and a woman possibly fighting. Patrolman Sean Stone responded and was advised by dispatch that the male left the station in a vehicle. The officer went in search of the man but was unable to find him. When the officer returned to the gas station, an ambulance was there with the victim, Ms. Jennifer Hudson ("Ms. Hudson"), and several other officers.

{¶5} Mr. Rice and Ms. Hudson have known each other since elementary school and have had a tumultuous relationship for a majority of that time. At the time of this incident, Ms. Hudson and their two children had an active civil protection order against Mr. Rice, which had been issued a year earlier by the Lake County Domestic Relations Court.

{¶6} Ms. Hudson told the police at the gas station she had been at Mr. Rice's grandmother's house, taking care of his grandmother who suffers from Alzheimer's, when Mr. Rice angrily appeared, accusing her of "hacking his phone and firestick." Ms. Hudson described Mr. Rice dragging her by her hair to his car, putting her in the back seat, and driving off. When Mr. Rice stopped the vehicle to talk to two men, Ms. Hudson jumped out of the car and started running. Mr. Rice chased after her, grabbed her by the neck, and pushed her back in the car. He took her phone and threatened to "pistol whip" her and "knock her teeth out." Ms. Hudson jumped out of the car again and started running toward the One Stop gas station. Mr. Rice chased her and started pulling her by the hair and punching her while his vehicle, a blue Jeep he had forgotten to put in park, started rolling at the intersection. Mr. Rice released her, jumped in the vehicle, and drove away. Ms. Hudson ran into the gas station. One of the witnesses, Mr. Kevin Leonard, who had seen the couple struggling and heard Ms. Hudson "yelling for help and asking to be let go," called 9-1-1.

{¶7} Patrolman Reyniva Pennza ("Officer Pennza") took Ms. Hudson's written statement, documented her injuries after Ms. Hudson received treatment for them in the ambulance, and drove her home. Ms. Hudson told her that Mr. Rice hit her. Officer Pennza observed Hudson's bottom lip was swollen. There were red markings on the left

3

side of her neck, a scratch mark, and injuries on the inside of her upper right arm. The officer took photographs of Mr. Hudson's injuries.

{¶8} In the days that followed, video of the altercation was taken from the One Stop gas station security cameras, and both Ms. Hudson and Mr. Leonard gave additional written statements to the police at the station.

{¶9} The police were unable to locate Mr. Rice and an arrest warrant was issued.

{¶10} Approximately two weeks later, Deputy Cory Eisenberg of the Lake County Sheriff's Department observed a blue Jeep with no headlights or taillights turning onto Fairgrounds Road from Mentor Avenue in Painesville Township. He initiated a stop and ran the identification of the occupants. Dispatch advised him that Mr. Rice had outstanding warrants from Painesville City and a current CPO protecting Ms. Hudson, who was the passenger. Deputy Eisenberg took Mr. Rice into custody, and Ms. Hudson drove the vehicle home.

### The Second Altercation – Case No. 2017-CR-001388

{¶11} In the late afternoon of December 22, 2017, dispatch for the Mentor Police Department received a call from Ms. Hudson on the non-emergency line. Ms. Hudson asked dispatch if they could send a patrol car because her daughter saw Mr. Rice driving past their home when she got off the school bus. Mentor Patrolman John Stirewalt responded and assured Ms. Hudson he would make extra checks of the area while he was on patrol.

{¶12} Almost one hour later, dispatch received a 9-1-1 call from Ms. Hudson that Mr. Rice had broken into the house. Ms. Hudson ran out the back door to the fire station because she noticed a police car there, but there was no one inside. Ms. Hudson went

4

back to her house. Mr. Rice grabbed her by the neck, forced her back into the house, and then fled. Officer Stirewalt again responded and noticed that the cardboard used to repair broken glass in the door had been punched through.

{¶13} Later in the evening, Ms. Hudson called the non-emergency line because Mr. Rice had been sending her threatening text messages.

{¶14} Patrolman Terry Wurgler responded to Ms. Hudson's call. The text messages from Mr. Rice were regarding his clothes. He texted he was going to "take his property back" and "he wouldn't be so nice this time." While Patrolman Wurgler was speaking with Ms. Hudson, a call came into dispatch reporting that Mr. Rice's blue Jeep was located at the Fairbridge Hotel in Wickliffe. He and Patrolman Haddad met with three Wickliffe officers at the hotel and went to Mr. Rice's room. Mr. Rice refused to open the door. Ultimately, the SWAT team and a hostage negotiator from Wickliffe arrived. At around 1:40 in the morning of December 23, 2017, Mr. Rice stopped communicating with the police. The SWAT team broke down the hotel door and took Mr. Rice into custody.

### The Court Proceedings

{¶15} After testifying before the Lake County grand jury, Mr. Rice was indicted in both cases. In Case No. 2017-CR-001334, Mr. Rice was indicted on six counts: (1) kidnapping, a first degree felony with a repeat violent offender specification ("RVO"); (2) robbery, a second degree felony with an RVO specification; (3) violating a protection order, a third degree felony; (4) and (5) domestic violence, fourth degree felonies; and (6) violating a protection order, a first degree misdemeanor.

{¶16} In Case No. 2017-CR-001388, Mr. Rice was indicted on eight counts: (1) burglary, a second degree felony with an RVO specification; (2) violating a protection

5

order, a third degree felony; (3) domestic violence, a fourth degree felony; (4), (6) and (7) violating a protection order, first degree misdemeanors; (5) obstructing official business, a fifth degree felony; and (8) menacing by stalking, a fourth degree felony.

{¶17} At trial, in addition to testimony and evidence of Mr. Hudson's prior convictions supporting the RVO specification and pictures of the injuries suffered by the victim in another earlier assault conviction, the state presented testimony from several officers who responded to the incidents, Ms. Hudson, an eyewitness to the gas station incident, and the gas station manager. The state also offered evidence of surveillance videos from the gas station showing the altercation, pictures of Ms. Hudson's injuries, phone calls between Ms. Hudson and Mr. Rice made while Mr. Rice was in jail between the two incidents and after, audio clips of Mr. Rice's grand jury testimony, and evidence of Ms. Hudson's 2016 active protection order against Mr. Rice.

### Events Preceding Ms. Hudson's Testimony

{¶18} Prior to impaneling the jury on the first day of trial, the court addressed Ms. Hudson's pro se Request for Appointed Counsel for Victims filed a day earlier. Ms. Hudson claimed that she and her children had not been afforded all of their rights guaranteed under Article I, Section 10a of the Ohio Constitution (commonly referred to as Marsy's Law, which expanded crime victim's rights). Attached to the request was a Financial Disclosure Form and a typed, unsigned statement purportedly from one of her children's counsellors at Family Pride of Northeast Ohio describing the increased anxiety and somatic symptoms the child was experiencing after learning he may be called as a witness at his father's trial.

6

{¶19} The court found Ms. Hudson failed to pursue her request because she failed to appear as instructed. The trial court noted that his staff had advised Ms. Hudson to appear at 8:30 a.m. on the day of trial for a hearing on her request. Ms. Hudson was also directed to appear at the same time on the same date pursuant to the state's subpoena.

{¶20} The court noted that Ohio's Marsy's Law amendment does not specifically provide for victim's counsel to be appointed at public expense. Its preliminary research from other states that have enacted Marsy's Law did not reveal any support for the proposition that the right to counsel for the victim encompasses a right to counsel at the state's expense. Further, the trial court noted that Ms. Hudson was advised over a week and half before trial to contact the Victim's Assistance Office, and putting the issue of compensation aside, the court could not even find counsel willing to assume representation on such short notice.

{¶21} The trial court denied Ms. Hudson's request, finding an attorney at the state's expense was not a requirement and, without her presence, it would be an impossible task. Confirming service and acknowledgement of receipt of the subpoena, the court then issued an arrest warrant to secure Ms. Hudson's presence and her testimony at trial.

{¶22} Later that day, Ms. Hudson was brought before the court after being arrested and taken to the Lake County jail. The court inquired why she did not appear before the court pursuant to subpoena and what assurances she would give that she would testify the following day. After assuring the court that she would return to testify, Ms. Hudson signed a personal recognizance bond to secure her release. She also signed a Notice of Acknowledgement of Potential Penalties Upon Release on Own

7

Recognizance Bond form advising her of a potential of 6 to 18 months in prison if she did not appear the next day for trial.

{¶23} Ms. Hudson did appear for trial the following day, and on the record, outside of the jury's presence, the court inquired of Ms. Hudson if she was prepared to testify. Ms. Hudson informed the court she hired an attorney because she was charged with a felony for failing to appear. The court clarified that Ms. Hudson was not charged with contempt of court, and explained the bond form Ms. Hudson had signed the day before. The court assured Ms. Hudson she was in court solely as a lay witness whose purpose was to testify, and she would only be charged if she had failed to appear.

### Ms. Hudson's Testimony

{¶24} Ms. Hudson told the jury that Mr. Rice had been convicted of attempted domestic violence in 2016 after an argument they had over money ended in physical harm. Mr. Rice pushed her, grabbed her by the neck, threw her up against a wall, hit her with her purse, and broke her phone.

{¶25} Ms. Hudson was then questioned about a petition for a domestic violence civil protection order for herself and their two children filed about a year later. Specifically, she was questioned about the allegations in her attached affidavit that Mr. Rice was convicted of assault after he choked her and dragged her by her hair, and then grabbed and pulled their daughter by the arm in November of 2013.

{¶26} At that point in her testimony she refused to answer further questions about this earlier incident. The trial court then granted the state's Motion for Calling of Court Witness Pursuant to Evidence Rule 614(A), which had been previously filed and held in

8

abeyance until the trial court heard her sworn testimony. The state and the defense were then permitted to pose questions to Ms. Hudson as if on cross-examination.

{¶27} When questioning by the state turned to the first altercation at the grandmother's house and at the gas station, she contradicted many of the details contained in her written statements to the police by now giving descriptions of Mr. Rice's actions in a more favorable light. She said Mr. Rice did not steal her phone; she dropped it. Mr. Rice did not punch her in the face because her arm blocked it. Mr. Rice did not throw her to the ground at the gas station; she pushed herself to the ground. Mr. Rice did not drag her by her hair into the car.

{¶28} There were two key series of questions posed by the state that drew requests by Ms. Hudson to speak to an attorney. First, when asked, "So he didn't push you into the car and put you in the backseat and tell you he was going to knock all your teeth out?" Ms. Hudson asked the court "if she could speak to an attorney about the question of this thing?" The court advised her that she needed to answer the question. Ms. Hudson's answer was, "No."

{¶29} The second related to Ms. Hudson getting out of the car by the gas station, which was caught on video and observed by an eyewitness:

Q.     "And you jumped out of the car and ran away?

A.     "I got out of the car and started walking.

Q.     "And Mr. Rice stopped you and grabbed you by your neck?

A.     "He picked me up and I got in the back of the car.

Q.     "But he grabbed you by your neck and slammed you into the car?

A.     "No.

Q.     "Okay. He put you back in the car?

A.     "No.

Q.     "You indicated he got you and put you back in the car?

A.     [Addressing the court]  "That's why I need to speak to my attorney about just this night * * *.

The Court:     "You're not in jeopardy from a legal perspective as I indicated.  You do need to testify truthfully, and you do need to answer the attorney's questions.

A.     "No he didn't."

{¶30}   When asked if she put "false statements" in the report, she answered, "Yeah."

{¶31} Regarding the second incident at her home, Ms. Hudson was again reminded of her written statements to the Mentor police and her 9-1-1 calls, which were played for her.  She agreed she had been met by Mr. Rice at the front door, grabbed by the neck, and pushed inside.

{¶32}  Ms. Hudson was also questioned about her many calls with Mr. Rice made between the dates of the two incidents at issue.  Ms. Hudson spoke with Mr. Rice about 24 times.  Some of those calls were recorded at the Lake County jail and played for the jury.   During one call, Mr. Rice told Ms. Hudson not to answer the subpoenas to testify at trial.  Ms. Hudson said she would tell the "victim assistance lady" that she "was telling lies."  She admitted making those statements explaining, "Yes. I did because I did tell lies."

{¶33} Ms. Hudson also testified as to calls between herself and Mr. Rice after the December 22, 2017 incident. In one of the calls, Mr. Rice suggested that she should not appear to testify. Ms. Hudson responded that she would either say she made it up or "say my son locked the door." She also testified that in one of the calls, she told Mr. Rice she had been "putting up with him putting his hands on her for two years now," and she did not feel safe with him because he was on drugs.

{¶34} Through cross-examination by Mr. Rice's attorney, Ms. Hudson told the jury that the preparation and filing of the CPO was done on her attorney's advice for "leverage" to keep custody of her children, and, further, she did not agree with everything on her affidavit. Regarding the gas station incident, she said Mr. Rice did not force her into the car when they left his grandmother's house. She was not scared. They were arguing, but because her brother lived around the corner, she just decided to get out and walk to her brother's house. After Mr. Rice finished talking to another driver, Mr. Rice picked her up. They began arguing again. She got out of the car near the gas station, and Mr. Rice came after her. She recalled him "pulling" her and then he let go. She dropped her phone, but Mr. Rice did not take it.

{¶35} Regarding the second incident at her home, she said Mr. Rice did not force her into her home, he just pushed her into the screen door. She also said Mr. Rice never made any aggressive moves toward her in the house because she was not in the house with him.

{¶36} Finally, defense counsel asked her if she felt the charges were appropriate, and she replied, "No." The court sustained an objection and instructed the jury to disregard the question and answer.

11

***Guilty Verdict and Sentencing***

{¶37}  The jury returned a guilty verdict on 13 of the 14 counts of the indictments, finding him not guilty of the robbery count in the gas station altercation.

{¶38}  In Case No. 2017-CR-001334, the gas station altercation, Mr. Rice was sentenced to a total term of 5 years and 12 months in prison with 16 days credit for time served.  In Case No. 2017-CR-001388, the second altercation, Mr. Rice was sentenced to a total prison term of 4 years and 24 months in prison with 119 days credit for time served.  The court ordered the sentences to be served consecutive to one another but concurrent to a sentence imposed in a third unrelated case, for a total prison term of 9 years and 36 months with 137 days credit for time served.

{¶39}  Mr. Rice now timely appeals, raising four assignments of error:

{¶40}  "[1.]  The trial court erred by ordering the arrest of the victim and threatening to hold the victim in jail unless she agreed to remain in the custody of victim's assistance until she was called to testify.

{¶41}  "[2.] The trial court erred by denying victim Hudson's request for court-appointed counsel, and after she was arrested for a felony, failing to ask her whether she wanted court-appointed counsel, and denying her access to her attorney when she testified.

{¶42}  "[3.]  The trial court erred by denying Rice's motion for acquittal as to the charges of kidnapping, menacing by stalking, and burglary.

{¶43}  "[4.]  The trial court erred by admitting Rice's grand jury testimonynwhere [sic] defense counsel was not pre[sent] [sic] at this critical stage and where defense counsel arranged for Rice to be transported to grand jury to testify."

12

**The Defendant Claiming the Victim Had a Right to Court-Appointed Counsel**

{¶44} Mr. Rice's first and second assignments of error raise issues that concern Ms. Hudson's rights under Marsy's Law. We fail to see how Ms. Hudson's arrest for failing to obey a subpoena and whether her rights as a victim were protected concern or affect Mr. Rice under the circumstances of this case. Simply put, Mr. Rice does not have standing to raise possible rights violations on Ms. Hudson's behalf nor do we find her testimony was coerced, thus affecting his due process right to a fair trial.

*Standing*

{¶45} "It is well established the before an Ohio court can consider the merits of a legal claim, the person seeking relief must establish standing to sue." *Moore v. Middlefield*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶21, citing *State ex rel. Ohio Academy of Trial Lawyers v. Sheward*, 86 Ohio St.3d 451, 469 (1999). "'Standing' is defined at its most basic as '[a] party's right to make to make a legal claim or seek judicial enforcement of a duty or right.'" *Id.,* citing *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶27, quoting *Black Law's Dictionary* (8th Ed.2004) 1442.

{¶46} "To succeed in establishing standing, plaintiffs must show that they suffered (1) an injury that is (2) fairly traceable to the defendant's allegedly unlawful conduct, and (3) likely to be redressed by the requested relief." *Id.* at ¶22, citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). "These three factors—injury, causation, and redressability—constitute 'the irreducible constitutional minimum of standing.'" *Id.*, citing *Lujan* at 560.

{¶47} Thus, in *State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, the Supreme Court of Ohio, in discussing a witness's right against self-incrimination as

13

compared to that of the defendant stated, "at trial, a defendant can neither assert the Fifth Amendment right against self-incrimination on behalf of a witness, nor, if the witness himself asserts his privilege, take advantage of an error of the court in overruling it." *Id.* at ¶35, citing *United States v. Fredericks*, 586 F.2d 470, 481 (5th Cir.1978). "The party, as contrasted to the witness, simply lacks standing." *Id.*, citing *United States v. Skolek*, 474 F.2d 582, 584 (10th Cir.1973). *See also State v. Hughes*, 8th Dist. Cuyahoga No. 107697, 2019-Ohio-1000, ¶12 (dismissing the victim-witness' appeal, of an order requiring her to disclose her medical providers under seal for court review under Marsy's Law because she lacked standing to appeal; "under Ohio law, the parties in a criminal case are the defendant and the state, not the victim").

**{¶48}** The Third Appellate District addressed a similar argument in *State v. Smith*, 3d Dist. Seneca No. 13-03-25, 2003-Ohio-5461, where the appellant, who was convicted of domestic violence against his wife, argued the trial court erred in holding an in-camera hearing on the victim-witness' privilege claims despite the victim's request for her retained counsel to be present for the hearing. The victim-witness' retained counsel was unavailable. The trial court denied her request for a continuance of the hearing and offered her a choice between proceeding pro se or with appointed counsel for the hearing, which she accepted. At the hearing, the victim was granted immunity for her part in the altercation and the trial court found the spousal immunity privilege did not apply.

**{¶49}** The Third District noted that "[a]n appeal is permitted only to correct errors which injuriously affect an appellant. * * * A party must demonstrate an *injury in fact*, which requires a showing that the party has suffered or will suffer a specific injury traceable to the challenged action and that this injury is likely to be redressed if the court

14

invalidates the action or inaction." (Emphasis sic.) (Citations omitted.) *Id.* at ¶22. It was pure speculation to conclude the appellant was convicted because the trial court did not grant a continuance to permit the victim's retained counsel to appear. *Id.* at ¶23.

{¶50} Because Mr. Rice does not have standing to assert claims on Ms. Hudson's behalf, we decline to address them in great detail. Suffice to say, the court was well within its power pursuant to R.C. 2941.48 to require Ms. Hudson to post bond since there was good reason to believe she would not appear to testify in Mr. Rice's criminal case. *See also State v. Hollins*, 8th Dist. Cuyahoga No. 103864, 2016-Ohio-5521, ¶28, citing *State v. Kirklin*, 8th Dist. Cuyahoga No. 50157, 1986 WL 4390 (Apr. 10, 1986) ("[u]nder R.C. 2941.48, a court may require a witness to post bond when there is good reason to believe she will not appear to testify in a criminal case. If the witness fails to post bond, the court may then order the witness committed to the county jail until she gives her testimony at trial"). Indeed, Ms. Hudson did not appear pursuant to the state's subpoena on the day of trial. Whether Ms. Hudson believes her rights as a witness or as a victim were violated is for her to raise and has no bearing on Mr. Rice's appeal.

### *Mr. Rice's Due Process Right to Fair Trial Were Not Impacted*

{¶51} The record does not support Mr. Rice's claim that compelling Ms. Hudson to testify amounted to "coercion" that affected her testimony *and* prejudiced Mr. Rice. The court compelled Ms. Hudson's presence but did not coerce her testimony. Once on the stand, she was free to testify as she wished. Ms. Hudson was never charged with a felony. Before taking the stand, she told the court she consulted with an attorney and, further, she was willing to testify. Moreover, the trial court fully explained to Ms. Hudson several times before she took the stand that she was not facing charges. The trial court

also explained to her during her examination that she was not in jeopardy by her testimony. On cross-examination, defense counsel had a full opportunity to, and in fact did, elicit favorable testimony.

{¶52} Throughout her testimony, Ms. Hudson minimized Mr. Rice's conduct toward her in each incident. She told the jury she lied in her written statements to the police, and when confronted with her earlier statements, she pushed back. During her examination by defense counsel, she offered testimony that was favorable to Mr. Rice's defense.

{¶53} As to the gas station altercation, Ms. Hudson testified that: Mr. Rice did not "force her" into the car, she was not scared, Mr. Rice did not steal her phone because she "dropped it," and she did not flee the car, but rather, her brother "lived right around the corner" and she was "just going to walk to his house." In the second altercation, Ms. Hudson testified that Mr. Rice did not break in the door but "reached in," she did not "recall exactly" what she told the police, and she did not remember Mr. Rice grabbing her neck or telling the police he did so.

{¶54} The jury was free to believe her courtroom testimony or her prior statements and recorded phone calls that contradicted that testimony.

{¶55} In support of his argument, Mr. Rice offered cases of coerced testimony affecting the defendant's rights to due process in support of his argument, but our review of those cases reveals circumstances that are glaringly different from the facts presented here.

{¶56} In *Rapheal v. Alaska*, 994 P.2d 1004, (S.Ct.2000), the Supreme Court of Alaska found the trial court coerced the testimony of the victim, thus depriving both the

16

victim and the defendant of due process. The trial court denied the victim-witness "nearly all of the basic fundamental protections that a defendant in a civil contempt proceeding must receive to comport with due process" by deciding, in an ex parte hearing with the prosecutor, to incarcerate her and place her children in protective custody until she testified. *Id.* at 1008, 1009. The court told the victim it would "revisit custody" after she testified. The victim remained in jail for three days, awaiting her turn to testify. The court then kept her in custody until the defense closed its case. *Id.* In Mr. Rice's case Ms. Hudson was never charged with contempt. She was released the same day she was arrested, and she returned on her own volition the next day to testify.

**{¶57}** Unlike the facts in *State ex. rel. Dorsey v. Haines*, 62 Ohio App.3d 580 (2d Dist.1991), where a material witness's right to due process was violated because the warrant to detain her was not supported with probable cause or an oath or affirmation, the bench warrant for Ms. Hudson was properly issued. *Id.* at 582.

**{¶58}** And unlike the witness in *Robinson v. Green,* 7th Dist. Mahoning No. 16 MA 0134, 2016-Ohio-5688, where the witness was detained without the "most fundamental rudiments of constitutional due process," Ms. Hudson was brought before the trial court to explain herself and given a bond. *Id.* at ¶9, citing *Dorsey* at 581.

**{¶59}** As the Third District in *Smith* so aptly stated: "[w]e are aware that in domestic violence cases it is not uncommon for the complaining witness to change her story, 'forget' details, or recant for any one of a variety of reasons including threats of reprisal or genuine reconciliation." *Id.* at ¶11, citing *State v. Attaway,* 111 Ohio App.3d 488 (1st Dist.1996); *State v. Brown*, 3d Dist. Allen No. 1-97-74, 1998 WL 227182 (May 8, 1998).

17

**{¶60}** As in *Smith*, Ms. Hudson was the state's primary witness. Had the trial court not compelled her testimony, the criminal acts may have gone unpunished. *Id.* at ¶12.

**{¶61}** Mr. Rice's first and second assignments of error are without merit.

### Motion for Acquittal

**{¶62}** In his third assignment of error, Mr. Rice contends the trial court erred in denying his motion for acquittal as to the charges of kidnapping, menacing by stalking and burglary because they are not supported by sufficient evidence and are against the manifest weight of the evidence. We will address each argument in turn.

**{¶63}** "The standard for determining whether a motion for acquittal is properly denied is set forth in *State v. Bridgeman*, 55 Ohio St.2d 261 (1978), syllabus as follows: 'Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime had been proved beyond a reasonable doubt.'" *State v. Davis*, 11th Dist. Lake No. 92-L-089, 1993 WL 548033, 8 (Dec. 10, 1993).

#### *Sufficiency of the Evidence*

**{¶64}** In his sufficiency of the evidence contention, Mr. Rice makes three arguments: (1) the state failed to produce evidence that he inflicted serious harm on Ms. Hudson during the gas station incident, (2) there was insufficient evidence Mr. Rice purposefully trespassed and committed burglary when he broke into Ms. Hudson's home during the second altercation on December 22, 2017, and (3) there was insufficient evidence to establish a pattern of menacing by stalking.

**{¶65}** "[T]he standard of review for a sufficiency of the evidence claim is 'whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most

18

favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.' * * * 'In essence, sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict * * *.'" (Citations omitted.) *State v. McFeely,* 11th Dist. Ashtabula No. 2008-A-0067, 2009-Ohio-1436, ¶23. "Sufficiency of the evidence tests the burden of production." *Id.*

**{¶66}** During the first gas station altercation, the state introduced ample evidence from which the jury could conclude Mr. Rice caused Ms. Hudson serious physical harm. Pursuant to R.C. 2905.01(A)(3), "[n]o person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, * * * [t]o terrorize, or to inflict serious physical harm on the victim or another."

**{¶67}** In the surveillance video from the gas station, one can see Mr. Rice pick up Ms. Hudson and throw her to the ground with brutal violent force. Officer Penza documented and testified as to the resulting injuries, and the pictures of the injuries were admitted. Ms. Hudson had "reddening and a little bit of an abrasion near her collar bone," her lip was "swollen and red," the inside of her lower lip had a red mark and cuts," and she had bruises on the inside of her right bicep area. Ms. Hudson also told Officer Penza that Mr. Rice had hit her, and then "she lifted up her lip and she showed me the inside of her mouth."

**{¶68}** Kevin Leonard, the eyewitness at the gas station, testified he could see Mr. Rice and Ms. Hudson struggling, and Mr. Rice had a "hold of her by her arm, or her hair,

19

or something." Ms. Hudson testified that Mr. Rice punched her when she ran out of the vehicle. She also testified that she pushed herself to the ground, but then Mr. Rice started pulling and dragging her back in the direction of his car.

{¶69} We conclude there was more than sufficient evidence introduced by the state that Mr. Rice intended to inflict serious physical harm to Ms. Hudson.

{¶70} In regard to the burglary charge, Mr. Rice contends there was insufficient evidence that he was trespassing because there was evidence Mr. Rice sometimes lived with Ms. Hudson and had a key.

{¶71} Burglary or trespass in a habitation when a person is present or likely to be present, is defined as "[n]o person, by force, stealth, or deception, shall * * * [t]repass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense." R.C. 2911.12(A)(2).

{¶72} The evidence introduced by the state by way of testimony of the officers and Ms. Hudson's testimony was that Mr. Rice broke in through the front door and assaulted Ms. Hudson. Pictures of the hole in the door, Ms. Hudson's statements to the police, and 9-1-1 calls were admitted and supported each element of the offense. There were also phone discussions between Mr. Rice and Ms. Hudson while Mr. Rice was in the Lake County Jail where the two debated Ms. Hudson's testimony, such as whether she should say the door was unlocked or their son had locked it and she "didn't know." In one call, Mr. Rice said otherwise if she testified he would get an additional five years, presumably for the burglary charge.

20

**{¶73}** A review of the evidence reveals the state introduced sufficient evidence from which the jury could conclude Mr. Rice broke into Ms. Hudson's home during the second altercation on December 22, 2017, knowing Ms. Hudson was in the house and with the intention to do her harm.

**{¶74}** Lastly, Mr. Rice contends there was insufficient evidence to show a pattern of conduct for menacing by stalking. Pursuant to R.C. 2903.211(A)(1), "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

**{¶75}** R.C. 2901.22(B) states: "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist."

**{¶76}** "Pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1).

**{¶77}** We have held that "R.C. 2903.211 does not attempt to define or give further meaning to the phrase 'closely related in time.' * * * Consequently, whether the incidents in question were 'closely related in time' should be resolved by the trier of fact 'considering the evidence in the context of all the circumstances in the case.'" (Citations omitted.) *State v. Brown*, 11th Dist. Lake No. 2014-L-032, 2015-Ohio-950, ¶38

**{¶78}** A review of the evidence introduced at trial reveals the state more than fulfilled its burden of production on this element. Ms. Hudson testified as to the volatile

21

and abusive past between herself and Mr. Rice. Mr. Rice was convicted of attempted domestic violence after he physically abused her in May of 2016. Ms. Hudson then filed for a protection order for herself and her two children later in 2016. In her affidavit that was attached to her protective order, Ms. Hudson stated that Mr. Rice also choked her and dragged her by the hair in November of 2013. In one of the jailhouse calls that took place between Ms. Hudson and Mr. Rice, Ms. Hudson indicated that she had been "putting up with him putting his hands" on her for two years now, and that she "didn't feel safe because he was on drugs."

**{¶79}** There is more than sufficient evidence that "two or more actions or incidents closely related in time" have occurred where Mr. Rice inflicted serious physical harm to the victim.

### *Manifest Weight*

**{¶80}** Although Mr. Rice raises manifest weight as an issue under this assignment of error and cites to the standard of review, he fails to provide any substantive argument in his brief. A review of the record, however, reveals there is nothing to suggest the jury clearly lost its way or there was a manifest miscarriage of justice such that a new trial must be ordered.

**{¶81}** "When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." (Citations omitted.) *McFeely*, at ¶77.

{¶82} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * * The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. * * * The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses." (Citations omitted.) *Id.* at ¶78.

{¶83} Based on the evidence and testimony at trial, we cannot conclude the jury so lost its way or created a manifest miscarriage of justice. The state carried its burden of proof as to the sufficiency of the evidence and the manifest weight of the evidence supports the jury's verdict. Ms. Hudson and numerous officers testified as to Mr. Rice's violent and abusive actions that harmed Ms. Hudson, in addition to the surveillance video catching a portion of the first incident on tape, the jailhouse calls, Mr. Rice's history of violent convictions, and clips of his grand jury testimony.

{¶84} "It is well-settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." (Citations omitted.) *Id.* at ¶81.

{¶85} In short, the jury was free to believe the version of events presented by the evidence and testimony of the state.

{¶86} Mr. Rice's third assignment of error is without merit.

**Ineffective Assistance of Counsel**

{¶87} In his last assignment of error, Mr. Rice argues that he was deprived of effective assistance of counsel when he testified before the grand jury because his counsel was not present during this crucial stage of the proceeding. This argument is without merit because Mr. Rice cannot say but for his counsel's deficient performance, there would not have been an indictment, and/or he would not have been found guilty.

{¶88} "'[W]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness.' * * * The [Supreme Court of Ohio] recognized that there are '(* * *) countless ways to provide effective assistance in any given case.'" (Citations omitted.) *McFeely* at ¶50. *See also Strickland v. Washington*, 466 U.S. 669, 687-689 (1984). Thus, the court's "judicial scrutiny of counsel's performance must be highly deferential." *Id.*

{¶89} "'[B]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance. (* * *).' * * * Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. [Thus,] [t]o warrant reversal, 'the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would be different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' * * *" (Citations omitted.) *Id.*

24

{¶90} In this case, there is simply no evidence that had Mr. Rice's counsel been present at the grand jury, Mr. Rice would have testified differently or asserted his Fifth Amendment right against self-incrimination.

{¶91} In *State v. Crickon*, 43 Ohio App.3d 171 (6th Dist.1988), the Sixth Appellate District was confronted with a similar situation. The appellant claimed his counsel should have moved to dismiss the indictment because of the undue influence of the prosecutor in not affording the appellant the opportunity to consult with his court-appointed attorney prior to the questioning before the grand jury. The appellant failed to show that a motion to dismiss the indictment would have been successful or done anything other than delay trial. *Id.* at 175. Further, his motion to suppress his testimony was granted. There was simply no substantial violation of an essential duty owed to appellant by counsel or deficient performance by counsel. *Id.*

{¶92} Similarly, here, Mr. Rice fails to demonstrate a substantial violation of an essential duty that his counsel owed to him or a deficient performance that would have changed his convictions.

{¶93} In *State v. Mamounis,* 11th Dist. Trumbull No. 2003-T-0163, 2005-Ohio-2654, defense counsel was not present in the room while the appellant provided testimony before the grand jury, but was available for outside consultation if the appellant chose to do so. The court held "[d]uring the course of his grand jury testimony, [appellant] had the opportunity to tell his side of the story and continued to respond to the jurors' questions and develop his story as he saw it. He was not compelled to continue to testify, and yet elected to make statements * * *." *Id.* at ¶23.

{¶94} There is quite simply nothing to suggest that had Mr. Rice's counsel been present Mr. Rice's grand jury testimony would have been different. Mr. Rice never requested to speak with counsel during his testimony. He was informed of his rights and specifically of his right against self-incrimination. He choose to tell his side of the story to the grand jury in the hope of avoiding indictment.

{¶95} Mr. Rice's fourth assignment of error is without merit.

{¶96} The judgment of the Lake County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J.,

TIMOTHY P. CANNON, J.,

concur.