[Cite as *State v. Puckrin*, 2020-Ohio-3562.]

# IN THE COURT OF APPEALS

## ELEVENTH APPELLATE DISTRICT

## ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2019-A-0073** |
| JEFFERY RANDALL PUCKRIN a.k.a. JEFFERY R. PUCKRIN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Case No. 2018 CR 00505.

Judgment: Affirmed.

*Cecilia M. Cooper*, Ashtabula County Prosecutor, and *Shelley M. Pratt,* Assistant Prosecutor, 25 West Jefferson Street, Jefferson, Ohio 44047 (For Plaintiff-Appellee).

*Matthew C. Bangerter*, The Bangerter Law Office, 4124 Erie Street, Willoughby, Ohio 44094 (For Defendant-Appellant).


MARY JANE TRAPP, J.

{¶1} Appellant, Jeffery Randall Puckrin, aka Jeffrey R. Puckrin ("Mr. Puckrin"), appeals from the judgment of the Ashtabula County Court of Common Pleas, which sentenced him to a 60-day jail sentence and two years of intensive community control sanctions after a jury found him guilty on one count of obstructing official business with a risk of physical harm to another person. We stayed Mr. Puckrin's sentence pending this appeal.

{¶2} Mr. Puckrin now raises two assignments of error, arguing there is insufficient evidence to support his conviction and that the jury's guilty verdict is not supported by the manifest weight of the evidence since there was no evidence that he hampered or impeded the police investigation of a 911 domestic dispute call from his wife, Angelina Puckrin ("Mrs. Puckrin").

{¶3} A review of the record reveals Mr. Puckrin's assignments of error are without merit. There is more than sufficient evidence from which a jury could find Mr. Puckrin obstructed official business, in that he repeatedly refused, both verbally and physically, to comply with the deputies' orders who were attempting to arrest him. Moreover, the manifest weight of the evidence more than supports the jury's verdict. Simply because there was a competing version of events between the state and Mr. Puckrin does not mean the jury so lost its way or that the verdict is unsupported.

{¶4} The judgment of the Ashtabula County Court of Common Pleas is affirmed.

**Substantive and Procedural History**

{¶5} In late summer of 2018, after a criminal bindover from the Ashtabula County Court, Western Division, the Ashtabula County Grand Jury indicted Mr. Puckrin with aggravated robbery, a first-degree felony, in violation of R.C. 2911.01(B)(1)(2); assault, a fourth-degree felony, in violation of R.C. 2903.13(A) &(C)(5); and obstructing official business, a fifth-degree felony, in violation of R.C. 2921.31(A) & (B). Charges of domestic violence, abduction, and resisting arrest were not pursued or presented to the grand jury.

{¶6} Mr. Puckrin pleaded not guilty at his arraignment and the case proceeded to be tried before a jury. Mr. Puckrin's charges and subsequent conviction stemmed from a domestic dispute in the summer of 2018, which involved Mr. Puckrin, Mrs. Puckrin, and

2

Mr. Puckrin's stepsons and Mrs. Puckrin's sons, William Alexander Wunsch ("Mr. Wunsch"), and Joshua Kline ("Mr. Kline").

**The Jury Trial**

{¶7}    At trial, the state presented the testimony of several deputies from the Ashtabula County Sheriff's Office:  Timothy Michael Wall ("Deputy Wall"), Brian Sterrick ("Deputy Sterrick"); Jonelle Gerke ("Deputy Gerke"), and Anthony Wood ("Deputy Wood"), as well as photographs of Mr. Puckrin, Mrs. Puckrin, and Mr. Kline, and the scene, and a recording of a 911 call made by Mrs. Puckrin.

{¶8}    The defense presented the testimony of Mr. Puckrin, Mrs. Puckrin, Mr. Kline, Mr. Wunsch, and Terri Clutter Parrish ("Ms. Parrish").   Ms. Parrish became acquainted with Mr. Puckrin when he volunteered at the Spire Institute, an athletic and academic organization in Ashtabula County, Ohio, of which she is a former employee.

**The 911-Call and Mrs. Puckrin**

{¶9}    On the evening of June 23, 2018, Mr. and Mrs. Puckrin were enjoying a bottle of wine at a local winery after dining out.  Mrs. Puckrin informed Mr. Puckrin that Mr. Kline, a recovering heroin addict, had "overdrawn their joint bank account."  According to Mrs. Puckrin, Mr. Puckrin told her "we're done."  She threw her glass of wine at him and her wedding rings, stormed out of the winery, and began walking down the road.  Mr. Puckrin chased after her in his truck.

{¶10}  Mrs. Puckrin testified that she was quite intoxicated and irrational, which she believes was due to the alcohol she ingested combined with the recent dosage increase of her Prozac medication.  She called Mr. Puckrin's sister-in-law, Julie Puckrin, to come get her.  Mr. Puckrin called her and asked her where she was approximately ten

3

minutes later. He found Mrs. Puckrin a short distance down the road. It is unclear whether he forced her into the truck, as she initially told dispatch and the deputies, or if she went voluntarily, as Mrs. Puckrin testified on the stand.

{¶11} While she was in the truck, Mrs. Puckrin first called her other son, Mr. Wunsch. She did not remember doing so because she was "drunk." On the stand, Mr. Wunsch described Mrs. Puckrin as the "most intoxicated I've probably ever seen her," "she was upset and – overemotional." He could hear Mr. Puckrin in the background saying, "they needed to have a conversation when they got back to the house" and that "this was complete bullshit." Mr. Wunsch could clearly hear Mrs. Puckrin punching Mr. Puckrin, and the call was then disconnected.

{¶12} Mrs. Puckrin testified that she was hitting Mr. Puckrin in the truck on the side of his head and his arm. She had first reported to dispatch and later, to the deputies, that Mr. Puckrin bit her fingers, but later denied this when she testified to the jury. She testified that Mr. Puckrin did not want to let her out of the car because "he's not gonna let me walk a curvy, windy road intoxicated."

{¶13} Mrs. Puckrin's second call in the truck was to 911. She got out of the vehicle while she was on the call and proceeded to again walk down the road. When she testified before the jury, she did not remember telling the 911 dispatcher that Mr. Puckrin would not let her out of the truck, that Mr. Puckrin called Mr. Kline threatening him, or that she talked to her son, Mr. Wunsch. She also did not recall telling the dispatcher that Mr. Puckrin "threatened to whoop the shit out of my son."

{¶14} Deputy Wall from the Ashtabula County Sheriff's Office was working as a dispatcher when he received a 911 call from a "frantic woman." She identified herself as

4

Mrs. Puckrin, and reported that Mr. Puckrin was trying to get her into his truck and then would not let her out. She told Deputy Wall that Mr. Puckrin was driving "80 miles an hour on South River Road." Deputy Wall testified that while they were on the call, Mrs. Puckrin got out of the vehicle and told him that Mr. Puckrin was threatening to go to her residence and assault her son, Mr. Kline. She would not stay in one place despite Deputy Wall's direction to do so. Deputy Wall informed Deputy Sterrick to respond to Mrs. Puckrin's location and sent Deputy Gerke and Deputy Wood to the Puckrins' residence.

{¶15} Deputy Sterrick received the dispatch that Mrs. Puckrin was being "pulled into" Mr. Puckrin's truck. He had difficulty locating Mrs. Puckrin because she was walking down the road. When he did, he noticed she was intoxicated and had blood stains on her clothing. She did not want to press domestic violence charges against Mr. Puckrin, but the department decided to file two counts of domestic violence against Mr. Puckrin for assaulting Mrs. Puckrin and, later, Mr. Kline.

{¶16} While Mrs. Puckrin was talking to Deputy Sterrick, she saw her son, Mr. Wunsch, pull up. Deputy Sterrick refused to let her go home with Mr. Wunsch and wanted her to "sign something," to which she said, "I am drunk. I'm not signing anything." She eventually did go home with Mr. Wunsch, and, by that time, Mr. Puckrin had already been taken away by the police.

{¶17} Mr. Puckrin testified that when Mrs. Puckrin told him at the winery that Mr. Kline had overdrawn their joint bank account, he told her, "I'm done with the situation." He was very upset because Mrs. Puckrin was telling him about "the money disappearing, and items being stolen from their house to purchase drug paraphernalia." He walked around the winery looking for Mrs. Puckrin after she stormed away. Approximately ten

5

minutes later, he called her and realized she was walking down the road. He took off his shirt because it was soaked with wine and began driving. When he finally found her, she was talking to someone on the phone. She got into the truck, started hitting him, and bit him on the bicep.

{¶18} After Mrs. Puckrin got out of the truck, he proceeded to drive home and called Mr. Wunsch to pick up Mrs. Puckrin. Mr. Wunsch was on Route 84 on his way back from work. Despite Mrs. Puckrin's earlier accounts to dispatch and the deputies, both Mr. and Mrs. Puckrin testified that the truck Mr. Puckrin was driving could not handle high speeds or drive over 40-45 miles per hour without shaking.

### The Altercation at the Puckrins' Home

{¶19} Deputy Gerke arrived first at the scene of the Puckrins' home. As she pulled into the driveway, she observed Mr. Puckrin, who did not have a shirt on, "over top of" Mr. Kline on the front porch, and "it appeared [Mr. Puckrin] was choking him."

{¶20} Deputy Gerke got out of her cruiser and told Mr. Puckrin to "come here," and "that he was under arrest." She testified she was arresting him because she observed him assaulting another male. According to Deputy Gerke, Mr. Puckrin refused and told her that she was on his property and that "he didn't have to listen to me." She ordered him to walk towards her with his hands behind his back. He refused to comply. He eventually walked towards her, with his hands out, and again told Deputy Gerke that she was on his property and "he didn't have to listen to me." She observed Mr. Kline sit up and noticed that his white tank top was ripped. She then testified that "[a]s I was walking towards him, and he was walking towards me, he raised his arms over his head and got into a – a bladed stance." She described a "bladed stance" as "like a fighting

6

stance" where the body is turned a bit with fists raised. He was about an arm's length away – in striking distance – and was pulling his fist back as if about to punch her.

{¶21} Deputy Wood, who had just arrived on the scene, took Mr. Puckrin down with Deputy Gerke's assistance. Deputy Gerke observed Mr. Puckrin punch Deputy Wood and told Mr. Puckrin to stop. She said Mr. Puckrin was lying on his back and Deputy Wood was attempting to take control of Mr. Puckrin to put handcuffs on him. She then observed Mr. Puckrin attempt to put his hand on Deputy Wood's firearm. Mr. Puckrin managed to get the holster latch/clip off the gun. Deputy Gerke then grabbed his hand, and with both of her hands, began to pry each finger off the gun. Both she and Deputy Wood were telling Mr. Puckrin to stop fighting, and when Mr. Puckrin had his hand on Deputy Wood's firearm, to "let go of his gun." Mr. Puckrin did not comply with either order. After Mr. Puckrin was handcuffed, she observed that Mr. Kline had removed his shirt and had visible injuries on his chest and neck. Due to Mr. Kline's injuries, she decided to press charges of domestic violence against Mr. Puckrin.

{¶22} Deputy Wood arrived on scene approximately 30 seconds after Deputy Gerke. He testified that as he pulled into the Puckrins' driveway, he observed Deputy Gerke approach two males, later identified as Mr. Puckrin and Mr. Kline. Mr. Puckrin was standing over Mr. Kline, and "it looked like they were in a struggle." He saw Deputy Gerke approach Mr. Puckrin and say something which he could not hear. He then observed Mr. Puckrin approach Deputy Gerke very aggressively. "He yelled something along the lines of, you're not gonna tell me what to – and at that time he was blading his body in a fighting stance. He had started to draw back his arm." Deputy Wood described "blading" as a "fighting stance, when you go to punch somebody, most people turn their bodies to the

7

side, and he started pulling his arm back like he was going to strike her," with clenched fists.

{¶23} Deputy Woods started sprinting towards Mr. Puckrin with the intention of stopping him from striking Deputy Gerke. He described Mr. Puckrin as appearing to grit his teeth with a red, angry face. Once Deputy Wood reached Mr. Puckrin, he was "taken to the ground, and he began to fight with us." He ordered Mr. Puckrin to stop fighting and to put his hands behind his back. Mr. Puckrin refused to do so and continued to strike the deputy with his fists while Deputy Wood was on top of him. Deputy Wood and Deputy Gerke both testified Deputy Wood and Mr. Puckrin were chest to chest, fighting on the ground. Deputy Wood could hear Deputy Gerke give orders to Mr. Puckrin, who repeatedly refused to comply.

{¶24} Deputy Wood started to deliver what is called "distraction or compliance blows, which are open-handed strikes using the palm of your hand into somebody's face, trying to get him to stop fighting." But Mr. Puckrin continued to keep fighting. Deputy Wood felt tugging on his duty belt but did not know that Mr. Puckrin was attempting to retrieve his firearm. He heard Deputy Gerke start yelling, "Let go of his gun. Let go of his gun." At that point, Deputy Wood realized Mr. Puckrin was pulling on his gun, so he started striking Mr. Puckrin to get him to stop what he was doing, including striking Mr. Puckrin with his fists, mostly on the front of his head.

{¶25} Deputy Wood further testified that he never held Mr. Puckrin in a choke hold, but at that one point he did have his hand on Mr. Puckrin's throat because Mr. Puckrin was trying to move. After the altercation, he noticed the holster hood or clip that keeps the firearm in place was down. Once the struggle was over, the deputies were able to

8

get control of Mr. Puckrin, and he was handcuffed. Because Mr. Puckrin received cuts from the fighting, an ambulance was called.

{¶26} After Mr. Puckrin was taken to jail and his possessions were checked in, Deputy Wood took it upon himself to go back to the Puckrins' residence and give Mrs. Puckrin her wedding rings. Mr. Wunsch, Mr. Kline, and Mrs. Puckrin were there, and Deputy Wood does not recall telling them that "I don't think he was going for my gun."

{¶27} Mr. Kline testified that Mr. Puckrin has never assaulted him. He admitted that he took some fire sticks and sold them and that he had some money in the Puckrins' joint bank account. He withdrew more money than he had in their account and over drafted it.

{¶28} Mr. Kline further testified that on the night of the incident, he was at home sleeping and "detoxing off of heroin." He stated that Mr. Puckrin came into his room and told him, "hey, come outside. We need to talk." Mr. Kline followed Mr. Puckrin outside. Mr. Kline testified that at that point he knew something was wrong and that Mr. Puckrin had "found out about something," but he "just didn't know what exactly it was at that point." He denied that Mr. Puckrin choked him. He also remembered Mr. Puckrin saying to Deputy Gerke upon her arrival, "[t]his is my house. What are you doing here?" He did not remember Deputy Gerke saying anything.

{¶29} He observed Deputy Wood tackle Mr. Puckrin to the ground and hold Mr. Puckrin in a choke hold with his back to Deputy Wood. He testified that Mr. Puckrin's hands were not on Deputy Wood's gun and that Mr. Puckrin was struggling to breathe. "His face was turning red, his lips were going blue, and his eyes were starting to go. That's when I told him, 'Randy, just' – because he was trying to breathe. He was pulling

9

at the officer's arm. And I told Randy, I was like, 'Just stop. He'll let go as soon as you stop trying to pull his arm off.'"

{¶30} Mr. Kline testified that he did not see Mr. Puckrin elbow or punch Deputy Wood and that the deputies never issued Mr. Puckrin any commands. Deputy Wood "just tackled him." He also did not know how his tank top got torn or why his throat and the back of his neck were red. Mr. Kline testified that Deputy Gerke and Deputy Wood were lying when they stated that Mr. Puckrin raised his fist at Deputy Gerke and that Deputy Wood was on top of Mr. Puckrin chest-to-chest. He testified that Mr. Puckrin never punched Deputy Wood or attempted to grab Deputy Wood's firearm.

{¶31} Mr. Puckrin testified that when he arrived home, he went to Mr. Kline's room and told him to "get up, we need to go outside and have a talk." He said that Mr. Kline did not give him a hard time and followed him out of the door. When asked how he was feeling, Mr. Puckrin testified that "Oh, I was going home to get some answers." Once Mr. Kline and Mr. Puckrin were outside, Mr. Puckrin testified that he "ended up directing [Mr. Kline] backwards. He ended up in a laying-down position." Mr. Puckrin said he had his hand on Mr. Kline's collarbone, and he was "asking [Mr. Kline], 'I want the truth.' That's all the more I got to say to him. I didn't get to ask him what it was about, what I'd went to home to ask him about, because at this point I see a Sheriff's car come down the road."

{¶32} When Deputy Gerke approached the porch, Mr. Puckrin testified that he started towards her and said "I'm Randy Puckrin, this is my property. And I asked her, I says, what are you doing here?" He denied that he put up his arms in a fighting stance and testified that he tends to "talk with my hands," stating, "I move my hands sometimes when I talk." He observed Deputy Wood pull up the driveway. He testified that Deputy

10

Woods "blasted me to grounds, like a vicious tackle. I mean, I had no idea what was going on at that time." He denied that he was threatening Deputy Gerke or getting ready to strike her. Mr. Puckrin testified that Deputy Gerke did not tell him he was under arrest. He denied punching or elbowing Deputy Wood. He testified that Deputy Wood had him in a choke hold, which caused him to black out momentarily, and that he had the wind knocked out of him when Deputy Wood knocked him to the ground.

{¶33} Mr. Puckrin further testified that he was not physically aggressive with anyone that day. The marks on Mr. Kline could "have been from laying down on the deck, yes, possibly." Like Mr. Kline, Mr. Puckrin testified that Deputy Gerke was lying when she said he was "within an arm's reach of her" and that he raised his fists to her, and that she never made the statements that he was to put his hands behind his back and that he was under arrest. Mr. Puckrin had no idea why the deputies were on his property, and he never fought with them. He never punched Deputy Wood nor grabbed Deputy Wood's firearm. He was also quite upset that Deputy Wood would take his wife's wedding rings from his checked-in possessions at the jail and return them to Mrs. Puckrin.

### Conviction and Sentence

{¶34} The jury returned a verdict of guilty as to the one count of obstruction of business and not guilty on the remaining counts of assault and aggravated robbery. Mr. Puckrin's motion for acquittal was denied. He was subsequently sentenced to 60 days in jail and two years of intensive community control sanctions.

{¶35} We stayed Mr. Puckrin's sentence pending this appeal.

{¶36} Mr. Puckrin now raises two assignments of error for our review:

11

{¶37} "[1.] The trial court erred to the prejudice of the Defendant-Appellant in denying his Motion for Acquittal made pursuant to Crim.R. 29(A).

{¶38} "[2.] The trial court erred to the prejudice of the Defendant-Appellant when it returned a verdict of guilty against the manifest weight of the evidence."

### Sufficiency of the Evidence

{¶39} In his first assignment of error, Mr. Puckrin contends the trial court erred in denying his Crim.R. 29 motion for acquittal because the state failed to present sufficient evidence that he obstructed official business. More specifically, he contends the state failed to produce any evidence that he committed an act that hampered or impeded the officers' investigation.

{¶40} "[T]he standard of review for a sufficiency of the evidence claim is 'whether after viewing the probative evidence and the inference[s] drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offense beyond a reasonable doubt. The claim of insufficient evidence invokes an inquiry about due process. It raises a question of law, the resolution of which does not allow the court to weigh the evidence.' * * * 'In essence, sufficiency is a test of adequacy[;] [w]hether the evidence is legally sufficient to sustain a verdict * * *.'" (Citations omitted.) *State v. Rice*, 11th Dist. Lake Nos. 2018-L-065 & 2018-L-066, 2019-Ohio-1415, ¶65. "Sufficiency of the evidence tests the burden of production." *Id.; see also State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997) (Cook, J., concurring).

{¶41} The jury found Mr. Puckrin guilty of one count of obstructing official business, in violation of R.C. 2921.31(A) & (B). R.C. 2921.31 states, in relevant part, as follows:

12

{¶42} "(A) No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

{¶43} "(B) * * * If a violation of this section creates a risk of physical harm to any person, obstructing official business is a felony of the fifth degree."

{¶44} Thus, in order to prove Mr. Puckrin obstructed official business, the state was required to produce evidence on five essential elements: (1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant does the act without a privilege to do so. *Girard v. Oakman*, 11th Dist. Trumbull No. 2017-T-0065, 2018-Ohio-1212, ¶36, quoting *State v. Brickner-Latham*, 3d Dist. Seneca No. 13-05-26, 2006-Ohio-609, ¶25.

{¶45} Mr. Puckrin contends there is no evidence from which a jury could find that he hampered or impeded the deputies from performing their duties. He argues that Deputy Gerke testified that at the time he was walking down from the front porch, he was not obstructing. He also contends that because the jury found him not guilty of aggravated robbery (from his attempt to grab Deputy Wood's firearm) and assault (from punching Deputy Wood), he complied with the deputies' commands. He was choked unconscious and could not have possibly performed any such acts.

{¶46} A review of the record reveals the state more than carried its burden of producing sufficient evidence to support a conviction for obstruction of official business. Deputy Gerke testified that Mr. Puckrin stated several times "that this was his property"

13

and that "he did not have to listen to her." Both deputies testified that Mr. Puckrin raised his fist and got into a fighting stance and that it appeared Mr. Puckrin was about to strike Deputy Gerke. Both deputies also testified that Mr. Puckrin refused to comply with their orders that he was under arrest, to stop fighting and resisting arrest, and to let go of Deputy Wood's gun. Generally, an individual can be found guilty of obstructing official business when he persists in performing a specific act when a police officer has told him to stop. (Citations omitted.) *Girard* at ¶52.

{¶47} For example, in *Girard*, the appellant argued on appeal there was insufficient evidence to support his conviction for obstructing official business because his actions did not impede or hamper the officers' domestic violence investigation. *Id.* at ¶32. We determined that the trial court justifiably found the appellant obstructed official business and that his actions impeded the officers' investigation of domestic violence because the appellant was repeatedly uncooperative. *Id.* at ¶53. A review of the officer's recording revealed more than sufficient evidence that the appellant hampered or impeded the investigation. *Id.* at ¶51. First, he initially denied that he had any guns in his bedroom. *Id.* at ¶55-56. Upon discovering otherwise, the officer had to tell the appellant four separate times to get away from his gun, with the appellant making statements between each command. *Id.* at ¶51. He also would not stop walking towards his firearm. *Id.* at ¶53.

{¶48} Similarly, in *State v. Parkhurst,* 11th Dist. Trumbull No. 2015-T-0041, 2016-Ohio-1018, we found the appellant's argumentativeness constituted an affirmative act that hampered or impeded the officer's issuance of a citation. *Id.* at ¶31.

{¶49} Simply because the jury found Mr. Puckrin not guilty as to the charges of assault and aggravated robbery does not equate to the state failing to carry its burden of production on a conviction for obstruction of official business. The state introduced more than sufficient evidence that Mr. Puckrin resisted arrest, took a fighting stance with the officers, refused to stop fighting, and further, attempted to retrieve a deputy's firearm. Thus, it is clear the state more than carried its burden of production, since it introduced multiple acts that hampered and/or impeded the deputies' investigation.

{¶50} Mr. Puckrin's first assignment of error is without merit.

**Manifest Weight of the Evidence**

{¶51} In his second assignment of error, Mr. Puckrin contends his conviction is against the manifest weight of the evidence because it is not supported by competent, credible evidence which proves his guilt beyond a reasonable doubt.

{¶52} "When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered." (Citation omitted.) *Rice* at ¶81. *See also Thompkins* at 387.

{¶53} "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * * The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. * *

15

* The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses." (Citation omitted.) *Rice* at ¶82.

{¶54} More specifically, Mr. Puckrin contends the jury's verdict is not supported by the manifest weight of the evidence because it is clear from the record that he was not actually in the process of striking Deputy Gerke. Deputy Wood wrongly interpreted Mr. Puckrin talking "with his hands" as a threat and "took him down." At most, he claims, the evidence shows he was simply trying to keep from losing consciousness with an officer's arm around his throat.

{¶55} The record belies Mr. Puckrin's argument and weighs heavily in support of the jury's verdict. The state, using Mrs. Puckrin's 911 call, the statements made to the deputies, and the deputies' testimony, depicted a scene where Mr. Puckrin repeatedly refused to comply with the deputies' orders. Deputy Gerke arrived on the scene of an aggressive domestic dispute. Mr. Puckrin was standing over Mr. Kline, who was laid out on the porch with his shirt ripped, and Mr. Puckrin appeared to be choking him. Mr. Puckrin was immediately uncooperative, asking Deputy Gerke why she was on his property. Deputy Gerke testified that when she told him he was under arrest and to come towards her, he appeared to take an aggressive fighting stance. Deputy Wood, who could not hear Deputy Gerke's commands, observed Mr. Puckrin take a fighting stance and draw his arm back as if he was going to strike Deputy Gerke. He then repeatedly refused to stop fighting when the deputies were attempting to restrain him. Even Mr. Kline, whose testimony mirrors much of Mr. Puckrin's, testified that he ran up to Mr. Puckrin and told him to stop fighting and resisting the deputies.

16

{¶56} A review of the record reveals that there are competing versions of events between the state's evidence and the defense. But simply because there is conflicting testimony does not mean the manifest weight of the evidence does not support the jury's verdict or that the jury lost its way.

{¶57} "It is well settled that when assessing the credibility of witnesses, '[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.' * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict." (Citations omitted.) *Rice* at ¶84.

{¶58} Mr. Puckrin's second assignment of error is without merit.

{¶59} The judgment of the Ashtabula County Court of Common Pleas is affirmed.


TIMOTHY P. CANNON, P.J.,

MATT LYNCH, J.,

concur.

17